Filed 9/16/15  P. v. Tauch CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>RICHARD VITHYA TAUCH,<br><br>  Defendant and Appellant. | B257033<br><br>(Los Angeles County<br>Super. Ct. No. GA078974) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stanley Blumenfeld, Jr., Judge.  Affirmed with modifications.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, William H. Shin and Eric E. Reynolds, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

A jury convicted Richard Vithya Tauch of two counts of first degree murder of Jenny Vanny Sor and Wen Wa Chao (Pen. Code, § 187, subd. (a)),[1] and found true multiple-murder and lying-in-wait special circumstances (§ 190.2, subd. (a)(3), (15)), as well as firearm enhancements (§ 12022.53, subd. (d)). He was sentenced to two consecutive life sentences without parole plus a consecutive 50 years to life for the firearm enhancements. He challenges his conviction on multiple grounds, claiming (1) his due process rights were violated when he was interrogated by undercover police officers in a jail cell after he invoked his right to counsel in a preceding interview by police; (2) the trial court erred in excluding evidence that, when he was a child in Cambodia under the Khmer Rouge, he witnessed a person's liver being extracted while he was still alive, which formed part of the basis for his expert's opinion that he suffered posttraumatic stress disorder; and (3) the trial court erred in instructing on the issue of provocation. He also challenges certain aspects of his sentence. We modify the judgment to correct two sentencing errors and affirm the judgment as modified.

## STATEMENT OF FACTS

### 1. Prosecution Case

On January 19, 2010, at around 7:50 p.m., appellant shot Sor, his ex-girlfriend, and Chao, the man she was seeing, multiple times as they stood in Chao's invalid father's apartment at his assisted living facility in Monterey Park. The prosecution theorized appellant was hiding in Sor's car when she drove to Chao's father's place, at which point he emerged, killed them, and drove away in Sor's car.

Prior to the shooting, appellant worked at the Hollywood Park Casino, first as an armed guard, then as an unarmed gaming supervisor. Victim Sor worked as a dealer at the casino. Sor and appellant were in a relationship, and in 2008 he moved into her apartment where she lived with her three children. While he lived there, he usually stayed in his and Sor's bedroom playing video games, which were first-person, shooter-style games that placed the player in the perspective of the character going around

---

[1] Undesignated statutory citations are to the Penal Code unless otherwise noted.

"killing enemies." He once showed Sor's son a gun and asked if he wanted to go target shooting; Sor's son declined. Occasionally, Sor's son heard arguments coming from Sor and appellant's bedroom and Sor slept outside the bedroom. Sor's son also saw appellant drive Sor's car.

Appellant moved out of Sor's apartment in December 2009. Prior to that, Sor seemed unhappy and appellant appeared stressed because Sor was "moody." But when he moved out, she appeared happier. She had also begun dating another man prior to appellant moving out. After appellant left the apartment, Sor told her son not to answer his calls or open the door if he visited. Appellant called approximately weekly and more frequently in the days leading up to the shooting. Sor's son told him a couple of times to stop calling and that Sor did not want to talk to him.

On the day of the shooting, appellant did not report for work at the casino. Sor worked her usual shift, clocking out for the day at 7:15 p.m. After work, she drove to the Lions Manor senior living facility in Monterey Park where Chao's invalid father lived. According to cell phone records, she called Chao on the way. When she arrived, she parked her car and entered room 113 through an exterior sliding glass door. Chao was there with his father and Rong Shen Diao, Chao's father's caretaker, and Diao's wife. Immediately after Sor entered the room, several gunshots were fired from the exterior patio. Sor and Chao were hit several times, but no one else was injured. Diao and his wife ran out of the room.

Jia Xiang Guo was in an upstairs room when Diao and his wife ran in. Guo had heard the gunshots and Diao said someone was shooting downstairs. Guo walked onto his balcony and saw a man run from room 113 to a white Toyota. The man opened the trunk, put something in it, briefly walked back toward the room, and then back to the car and drove away. Guo was able to write down a partial license plate number and police later identified the car as belonging to Sor.

Officers responded to the shooting at approximately 7:54 p.m. They found Sor's and Chao's bodies, as well as shell casings on the patio, and fired bullets, bullet fragments, and casings inside the apartment. All the casings came from .40-caliber Smith

3

and Wesson ammunition.  It was determined Sor and Chao died from multiple gunshot wounds.  No sooting or stippling was found on either victim, indicating the shots were fired from more than two feet away.

On January 20, 2010, the day after the shooting, appellant turned himself in at the front counter of the Monterey Park police station.  He said he had done something wrong and should be arrested.  He also said his car was in the parking lot and contained four guns.  He had Sor's driver's license in his wallet.  A search of his car yielded a nametag with the last name "Tauch"; his passport; four semiautomatic handguns, including a .40-caliber Sig Sauer in a holster; .40-caliber ammunition; and two empty Smith and Wesson ammunition boxes.  He was the registered owner of the car and two of the guns; his ex-wife was the registered owner of one of the guns.  Ballistics analysis matched the casings and several of the bullet fragments recovered from the shooting to the gun in the holster.

After appellant turned himself in, detectives interviewed him in an interview room at the police station.  He was not under arrest at the time and he was not given *Miranda* advisements.[2]  He asked several times to be arrested or killed.  He described the guns in his car.  He explained Sor had been cheating on him and he had not met Chao before the shooting.  He then requested an attorney and the interview concluded.

Following the interview, he was placed in a jail cell with an undercover deputy posing as an inmate.  He asked what the deputy was in jail for and the deputy said he hit his wife.  Appellant immediately volunteered, "I killed."  In a back-and-forth exchange with the undercover officer, he explained he killed his "wife" and her boyfriend with a .40-caliber Sig Sauer the night before in Monterey Park because they cheated.  He explained he followed her from work to her boyfriend's house and when he saw them, he could not stop himself.  He fired 10 rounds at them and tried to shoot himself but ran out of bullets.  He said, "I was just going crazy, I wish I was thinking."  He also said, "They will probably execute me or I'll stay here sixty years or something."  A second

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

4

undercover deputy entered the cell and asked why appellant was in jail. He responded that he had killed two people.

Sor's car was found undamaged on January 22, 2010, in a parking lot in San Gabriel.

## 2. *Defense Case*

Appellant did not seriously contest that he perpetrated the killings. Instead, his defense was that he hid in Sor's car to propose to her, but he heard her speaking on the phone with Chao and heard Cambodian music on the radio, which triggered the posttraumatic stress disorder (PTSD) he developed from traumatic experiences he had growing up under the Khmer Rouge in Cambodia and later after he moved to the United States.

Nancy Kaser-Boyd, a clinical and forensic psychologist and a specialist in PTSD, interviewed appellant twice and reviewed his jail records, which indicated he reported having flashbacks and nightmares. He had been given medication and was on suicide watch. She explained that, when he was 11 in Cambodia, his father was taken away and murdered, at which point his family fled to a communist work camp. He was separated from his family and placed in a children's group, where he was starved, beaten, and raped by the village chief's son. He witnessed executions of people who stole food and a man and woman who committed adultery, both of which were violations of the Khmer Rouge code of conduct. While escaping Cambodia, he witnessed his friend's mother blown up by a land mine. When he worked as an armored truck security guard in America, he witnessed a coworker die of a heart attack and saw another coworker shot and wounded during a robbery attempt. Kaser-Boyd opined appellant suffered from severe PTSD based on those traumatic experiences.

She explained the three common "symptom clusters" of PTSD are (1) experiencing recurrent unwanted memories of the traumatic event; (2) avoiding reminders of the traumatic event, including by using drugs or alcohol; and (3) being hypervigilant to danger, having trouble calming down, and having trouble controlling emotions. When presented with a hypothetical involving someone with PTSD hiding in

5

his girlfriend's car intending to propose to her, hearing her speak to a new boyfriend on the phone, and hearing Cambodian music on the radio, Kaser-Boyd opined the person in that situation would have reacted emotionally, and the music could have triggered traumatic memories of Cambodia. He could have entered a disassociative episode during which he acted out of character.

Sor's sister testified Sor's primary language was Cambodian and she liked to listen to Cambodian music in the car. Appellant's mother testified she spoke with appellant on January 19, 2010, then went to a jewelry store in Long Beach, where she obtained three rings without large mounted stones. She dropped them off with appellant, who was staying at her daughter's house in San Gabriel. He left, and later she picked him up on San Gabriel Boulevard when he called her. She dropped him off at the Hollywood Park Casino parking lot.

## DISCUSSION

### 1. Admission of Appellant's Jailhouse Confession Did Not Violate Due Process.

The prosecution sought to introduce three sets of statements by appellant—his initial statements when he turned himself in at the police station; his statements to officers during his interview; and his statements to undercover officers in his jail cell. In the middle of his interview with officers, he asked if he could have a lawyer. One officer responded, "Okay, that's fine you understand if you ask for a lawyer we can't talk and get your side of the story. And you're worried . . . ." Appellant said, "That's okay, whatever I say it's just there already. It hurts me more to remind me . . . I don't know. I only remember (inaudible)." The officers told him he was not under arrest and asked him more questions. Near the end of the interview, one of the officers said he would like to know where Sor's car was located, so "if you decide you want to tell me, if you'd like to call a lawyer and have them tell me . . . we'd like to find the car for the boys." Appellant responded, "I'd like to have a lawyer tell you." Shortly thereafter the officers ended the interview.

Appellant was later placed in a cell with undercover officers and essentially immediately confessed to the shooting without prompting, as discussed above. In the

6

course of that conversation, the first undercover officer placed in the cell asked him if he had talked to a lawyer or had been given a lawyer, and appellant responded he had to wait until his arraignment. He said officers had not let him make a phone call or read him his *Miranda* rights. When the officer asked if he talked to the police, appellant said, "I asked them to get me a lawyer. I didn't want to cop [to] the whole thing cause [*sic*] I told them mostly part of it already. I don't want to, if they want to execute me and whatever . . . go ahead, I got nothing else to lose anyway . . . but do it the right way for my own rights too." Later after the second undercover officer was placed in the cell, appellant said he had to go to court that Friday but he did not have a lawyer. One of the officers said he would be appointed a lawyer and the other officer said he should talk to that lawyer.

Appellant objected to the admission of his statements to the undercover officers, arguing they violated his Fifth Amendment *Miranda* rights as well as his Sixth Amendment right to counsel. The court relied on *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*) to find appellant's *Miranda* rights were not violated because he did not know his cellmates were police officers and his Sixth Amendment right to counsel was not violated because he had not yet been charged with any crime. Citing *People v. Guilmette* (1991) 1 Cal.App.4th 1534 (*Guilmette*) and a series of out-of-state cases, the court rejected appellant's attempt to distinguish *Perkins* on the ground that appellant invoked his right to counsel before he was questioned by undercover officers. The court also concluded appellant was not in custody during his initial interview with the police, so he could not anticipatorily invoke his right to counsel in order to trigger any protections while he was speaking to undercover officers in the jail cell.

The court also rejected any argument that admitting appellant's jail confession violated due process. The court noted his confession could have been coerced even in the absence of police interrogation if appellant's will was "overborne," but that did not happen here: "[Appellant] blurted out that he had 'killed' immediately after being introduced to his 'cellmate.' The undercover agent, a man of short stature and nonthreatening physical appearance, acted as a friendly cellmate. He spoke in soft and

7

nonthreatening tones and made no promises or threats. A review of the audio recording reveals a complete absence of coercion within the meaning of due process."

In reviewing the trial court's ruling, "'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.'" (*People v. Gamache* (2010) 48 Cal.4th 347, 385.) The parties here do not dispute the facts, so we independently review the trial court's ruling admitting appellant's statements to undercover officers in his jail cell.

Appellant does not pursue his *Miranda* and Sixth Amendment arguments on appeal. Instead, he relies on a concurring opinion by Justice Brennan in *Perkins* to argue his due process rights were violated. In *Perkins*, while in custody on unrelated charges, the defendant was placed in a cell with an undercover government agent. The agent proposed an escape plot, and the defendant made statements implicating himself in the crime the agent sought to solve. The defendant had not been given *Miranda* warnings, which he claimed rendered his statements inadmissible. (*Perkins, supra*, 496 U.S. at pp. 294-295.) The court found no *Miranda* violation because "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone that he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. [Citations.] When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." (*Id.* at p. 296.) California law is in accord. (*People v. Williams* (1988) 44 Cal.3d 1127, 1141-1142 [*Miranda* "has never been applied to conversations between an inmate and an undercover agent."]; see *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 284 [no *Miranda* violation from admitting recorded statements to inmate wearing wire]; *People v. Tate* (2010) 49 Cal.4th 635, 685-687 [no *Miranda* violation in admitting statements to defendant's girlfriend in midst of custodial interrogation]; *People*

*v. Webb* (1993) 6 Cal.4th 494, 526 [no *Miranda* violation in admitting telephone conversations recorded by defendant's girlfriend for police].)

Concurring in the judgment in *Perkins*, Justice Brennan agreed that "when a suspect does not know that his questioner is a police agent, such questioning does not amount to 'interrogation' in an 'inherently coercive' environment so as to require application of *Miranda*." (*Perkins, supra*, 496 U.S. at p. 300 [conc. opn. by Brennan, J.].) He noted, however, that the "deception and manipulation practiced on respondent raise a substantial claim that the confession was obtained in violation of the Due Process Clause," an issue not raised in the case. (*Id.* at p. 301.) Quoting *Miller v. Fenton* (1985) 474 U.S. 104, 109-110, he set out the following standards to evaluate this type of claim: "'This Court has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment. . . . Although these decisions framed the legal inquiry in a variety of different ways, usually through the "convenient shorthand" of asking whether the confession was "involuntary," [citation], the Court's analysis has consistently been animated by the view that "ours is an accusatorial and not an inquisitorial system," [citation], and that, accordingly, tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness.' [¶] That the right is derived from the Due Process Clause 'is significant because it reflects the Court's consistently held view that the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.'" (*Perkins*, at pp. 301-302.)

Justice Brennan believed the facts in *Perkins* deserved "close scrutiny" because "[t]he police devised a ruse to lure respondent into incriminating himself when he was in jail on an unrelated charge. A police agent, posing as a fellow inmate and proposing a sham escape plot, tricked respondent into confessing that he had once committed a

9

murder, as a way of proving that he would be willing to do so again should the need arise during the escape." (*Perkins, supra*, 496 U.S. at p. 302 [conc. opn. of Brennan, J.].) The testimony from the undercover officer and an informant revealed the "deliberate manner" of the questioning and the nature of custody gave the state "virtually complete control over the suspect's environment. Thus, the State can ensure that a suspect is barraged with questions from an undercover agent until the suspect confesses." (*Id.* at pp. 302-303.) He concluded, "[t]he deliberate use of deception and manipulation by the police appears to be incompatible 'with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means,' [citation], and raises serious concerns that respondent's will was overborne. It is open to the lower court on remand to determine whether, under the totality of the circumstances, respondent's confession was elicited in a manner that violated the Due Process Clause. That the confession was not elicited through means of physical torture, [citation] or overt psychological pressure, [citation], does not end the inquiry. '[A]s law enforcement officers become more responsible, and the methods used to extract confessions more sophisticated, [a court's] duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made.'" (*Id.* at p. 303.)

*Perkins* did not involve precisely the same facts as we have here: a defendant who invoked his *Miranda* rights first and then confessed to undercover officers placed in his cell. But numerous California courts have found no *Miranda* violation in similar circumstances. (See *People v. Thornton* (2007) 41 Cal.4th 391, 432-433 [no *Miranda* violation in admitting voluntary statements to defendant's grandmother after defendant invoked 5th Amend. rights]; *People v. Davis* (2005) 36 Cal.4th 510, 555 [no *Miranda* violation in admitting recorded statements to defendant's cellmates after defendant refused to waive *Miranda* rights]; *People v. Mayfield* (1997) 14 Cal.4th 668, 758 [no *Miranda* violation in admitting statements to defendant's father after defendant declined to waive *Miranda* rights and invoked right to counsel], disapproved on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2; *People v. Jefferson* (2008) 158 Cal.App.4th 830, 840-841 [no *Miranda* violation in admitting recorded statements to

10

cellmate after defendant invoked *Miranda* rights]; *People v. Plyler* (1993) 18 Cal.App.4th 535, 544-545 [no *Miranda* violation from recorded telephone calls with defendant's girlfriend who was working with police after defendant invoked right to counsel]; *Guilmette, supra*, 1 Cal.App.4th at pp. 1540-1542 [no *Miranda* violation in admitting recorded telephone calls between defendant and victim after defendant invoked his *Miranda* rights].)

Assuming appellant's due process claim is distinguishable from the *Miranda* claims repeatedly rejected in these cases (a point we need not decide), he can only show a due process violation even under Justice Brennan's formulation of the concept if the totality of the circumstances demonstrates his will was overborne and he was subjected to "deception and manipulation" incompatible with the presumption of innocence and the inquisitorial nature of our legal system. (*Perkins, supra*, 496 U.S. at p. 303 [conc. opn. of Brennan, J.].) That standard was not met here. Most importantly, appellant does not challenge the trial court's factual findings that he was not subject to any sort of coercion that led to an involuntary confession. Instead, the undercover agent who first entered the cell was physically nonthreatening, acted friendly, spoke softly, and uttered no threats or promises. Nor did the officer elicit appellant's initial inculpatory statement; as the trial court found, appellant was the one who "blurted out that he had 'killed' immediately after being introduced to his 'cellmate.'" Unlike in *Perkins*, the officer did not say anything to trick or manipulate appellant into confessing; he merely engaged appellant in casual conversation after appellant volunteered that he had "killed" someone. While we understand appellant's discomfort with the idea that he could invoke his right to counsel only to have the police circumvent it by placing an undercover officer in his cell, nothing distinguishes this case from the line of *Miranda* case law rejecting similar claims. Without a stronger showing of deception and manipulation repugnant to our system of justice, we are compelled to reject appellant's due process claim and find the court properly admitted his statements.

11

*2. **The Trial Court Properly Limited Expert Testimony on Appellant's Experiences in Cambodia.***

The prosecutor initially sought to exclude statements appellant made to Kaser-Boyd about his experiences in Cambodia and the United States that could have contributed to his PTSD, arguing they were hearsay and more prejudicial than probative. The prosecutor later clarified he was only objecting to appellant's statement to Kaser-Boyd that he had witnessed a man's liver being removed and eaten. Defense counsel argued the liver episode should be admitted because it was traumatizing and still impacted appellant 30 years later. In line with the prosecutor's objection, the trial court admitted appellant's statements to Kaser-Boyd about his experiences in Cambodia and the United States as recounted above, but excluded testimony about the liver incident under Evidence Code section 352 because it was "obviously very inflammatory" and had limited probative value in light of appellant's other "extraordinarily traumatic" experiences. The circumstances Kaser-Boyd would describe were "quite ample and sufficient to convey what she needs to convey without the inflammatory part of that description." Appellant contends this ruling was erroneous. We disagree.

Under Evidence Code section 352, a trial court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review exclusion of evidence under Evidence Code section 352 for abuse of discretion. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

Kaser-Boyd was permitted to testify to many of appellant's horrific experiences in Cambodia, including that he was starved, beaten, and raped; he witnessed executions; he saw a friend's mother get blown up; and his father was murdered. She also described his traumatic experiences in the United States, including witnessing a coworker die of a heart attack and seeing another coworker shot during a robbery attempt. Based on these events, she was able to conclude appellant suffered from severe PTSD and was able to give her opinion in response to a hypothetical question that appellant could have had a

disassociative episode during the shooting. It was eminently reasonable for the trial court to conclude that the graphic and inflammatory liver episode added very little to her testimony regarding the other horrific events in appellant's life. We cannot say the court abused its discretion in excluding it.[3]

### 3. *The Court Properly Instructed on Provocation and Any Error Was Harmless.*

Appellant claims the court misinstructed the jury with CALCRIM No. 522 and CALCRIM No. 570 because those instructions, in combination, allowed the jury to improperly apply an objective standard of reasonableness when assessing provocation to decide between first degree and second degree murder, when a subjective standard applies. We disagree.

As given to the jury, CALCRIM No. 522 stated: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

CALCRIM No. 570 defined the difference between murder and voluntary manslaughter based on a sudden quarrel or the heat of passion, including how provocation affects that determination:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

---

[3]     To the extent appellant argues his constitutional right to present a defense was violated by the exclusion of this evidence, the court's "application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon this right [citations]." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

13

"1. The defendant was provoked;

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

The jury was also read CALCRIM No. 520 defining murder and CALCRIM No. 521 defining first degree murder under two separate theories: premeditation and deliberation; and lying in wait.

"In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant. [Citation.] We consider the instructions as a whole and

14

assume jurors are intelligent persons capable of understanding and correlating all the instructions." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*).)

In *People v. Jones* (2014) 223 Cal.App.4th 995, Division Four of this district rejected an identical challenge to CALCRIM Nos. 520, 521, 522, and 570. For the reasons explained in that opinion, we also reject appellant's contention. First, appellant forfeited his argument by failing to object or otherwise request any modification of CALCRIM No. 522 and 570 in the trial court. (*Jones, supra*, at p. 1001.) Although appellant argues he did not forfeit his claim because the court's erroneous instructions affected his substantial rights (§ 1259; *Hernandez, supra*, 183 Cal.App.4th at p. 1331, fn. 2), the instructions accurately set forth the requirements of first degree murder and provocation (*Jones, supra*, at p. 1001; see *Hernandez, supra*, at p. 1334 ["Considering CALCRIM Nos. 521 and 522 together, the jurors would have understood that provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation."]). Thus, there was no reasonable likelihood the jury understood the instructions as appellant contends. (*Hernandez, supra*, at p. 1332.)[4]

Further, even if the instructions on provocation were confusing or misleading, appellant suffered no conceivable prejudice under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836-837 [reasonable probability of different verdict].) As noted, the jury was presented with two theories of first degree murder: premeditation and deliberation; and lying in wait. While the verdict forms did not require the jury to specify a theory of first degree murder, the jury unanimously found true the special circumstance that appellant killed his victims while lying in wait. (§ 190.2, subd. (a)(15).) The elements of first degree murder by lying in wait and the lying-in-wait special circumstance overlap,

---

[4] Appellant also contends that, to the extent his argument was forfeited, his counsel was deficient for failing to object. But the objection lacks merit, so his counsel was not deficient for failing to raise it. (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)

15

but the special circumstance also requires a finding of a specific intent to kill, whereas first degree murder by lying in wait does not. (*People v. Superior Court* (*Bradway*) (2003) 105 Cal.App.4th 297, 309.) Because the jury found the special circumstance true—including the additional intent-to-kill element—then it necessarily would have also found him guilty of first degree murder by lying in wait. The instructions on provocation were irrelevant to that theory: "A murder committed by lying in wait is always first degree murder. 'All murder which is perpetrated by means of . . . lying in wait . . . or by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree.' (Pen. Code, § 189.) Therefore, if the jury found murder by lying in wait, provocation was irrelevant because the murder could not be reduced to second degree murder." (*People v. Battle* (2011) 198 Cal.App.4th 50, 75.) Thus, any errors in the provocation instructions would have had no effect on the jury's first degree murder verdict.

## 4. Sentencing Issues

### A. The Gun-use Enhancement Did Not Violate Double Jeopardy.

Appellant contends the additional 50-years-to-life sentence imposed for the gun-use enhancements (§ 12022.53, subd. (d)) violated double jeopardy principles. But he acknowledges his argument is foreclosed by *People v. Sloan* (2007) 42 Cal.4th 110, 122-123, and *People v. Izaguirre* (2007) 42 Cal.4th 126, 134, in which our high court rejected double jeopardy challenges and held enhancements should not be considered elements of charged offenses when applying the multiple conviction rule. We are bound by these decisions, so we reject his claim.

### B. The Parole Revocation Fine Must Be Stricken.

Appellant contends his $300 parole revocation fine should be stricken because his sentence does not include a period of parole. (§ 1202.45.) Respondent agrees, as do we. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.) We will order the fine stricken.

16

*C. The Multiple-murder Special Circumstance for Count 2 Must Be Stricken.*

The jury found two multiple-murder special circumstances true, one for each murder count. Appellant asks us to vacate the multiple-murder special circumstance finding for count 2 as superfluous. Respondent agrees. They are correct that there can only be one multiple-murder special-circumstance finding in a multiple-murder case. (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 422.) The remedy is to strike the finding as to count 2. Appellant's sentence is not otherwise affected. (*People v. Garnica* (1994) 29 Cal.App.4th 1558, 1564 [a single multiple-murder special-circumstance finding can support multiple sentences of life without parole].)

## DISPOSITION

We modify the judgment to strike the parole revocation fine and strike the multiple-murder special-circumstance finding for count 2. The trial court is directed to forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation. We affirm the judgment as modified.


FLIER, J.

WE CONCUR:



RUBIN, Acting P. J.



GRIMES, J.

17