Filed 8/3/21  P. v. Villanueva CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B305458 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA092568) |
| v. | |
| AARON VILLANUEVA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathryn A. Solorzano, Judge.  Affirmed as modified.

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Aaron Villanueva of one count of first degree murder and found true allegations that the crime was gang-related and that Villanueva personally discharged a firearm causing death.  The trial court sentenced him to a total term of 50 years to life in state prison.

On appeal, Villanueva contends that: (1) the trial court erred in admitting statements Villanueva made to an undercover agent while in jail; (2) the trial court violated his due process rights when it instructed the jury, pursuant to CALCRIM No. 315, to consider an eyewitness's level of certainty; (3) trial errors accumulated in such a manner as to deprive him of his right to a fair trial; (4) the matter must be remanded to the trial court because it was unaware of its discretion to replace the firearm enhancement found true by the jury with a lesser included firearm enhancement; and (5) the trial court erred by failing to award Villanueva credit for the days he actually spent in custody.

We conclude, and the People concede, that the trial court erred in failing to award Villanueva presentence custody credits and we modify the judgment to award him the credit he is due. Discerning no cognizable or reversible error in the remaining claims, we affirm in all other respects.

## FACTUAL BACKGROUND

### A.    *Prosecution Evidence*

1.    *The shooting of victim Mark Gonzales*

At approximately 8:00 p.m. on January 28, 2016, Mario Ruiz was outside of his Venice apartment on 7th Avenue, between Sunset Boulevard and Flower Avenue, when he saw his friend Mark Gonzales and Gonzales's girlfriend, Lori Martinez. The couple was arguing.  Upon reaching the intersection of 7th

2

and Flower Avenues, Gonzales crossed the street while Martinez lagged behind him at the corner.

Ruiz watched as an SUV stopped between Gonzales and Martinez. The SUV had two people in the front and one in the back. The rear passenger got out of the SUV and approached Gonzales.

After announcing that he was from "Culver City," the passenger used a handgun to fire multiple shots from a distance of approximately 10 feet. The shooter returned to the SUV and it drove away from the scene in an eastbound direction.

Responding police officers found Gonzales unresponsive on the ground. Nine spent .40-caliber casings were near his body. Gonzales died as a result of a gunshot wound to the back of his head. He sustained a second gunshot wound to his heel.

> 2. *Eyewitnesses Ruiz and Martinez select Villanueva's photo from six-pack lineup*
>
> a. <u>Mario Ruiz's identification</u>

Although the shooter wore a hoodie sweatshirt, Ruiz could see that he was a young Hispanic male who appeared to be 22 to 25 years old. Ruiz described the shooter as about six feet tall with a thin build. Ruiz believed that the shooter used his right hand to fire the bullets from a large black handgun. Ruiz told his wife what happened, but did not speak to any of the police officers who responded to the shooting. When Ruiz was interviewed by detectives three days after the shooting, he recounted his observations but said that he did not want to get involved.

On March 8, 2016, Detective Herman Frettlohr conducted a recorded interview of Ruiz and showed him a six-pack of photographs. Ruiz selected Villanueva's photograph, stating "[i]t looks like it's him, dark skinned." Ruiz, however, was not sure

3

that the person he selected was the shooter. Ruiz also repeatedly told the detective that he would not go to court because he feared for his family's safety.

At Villanueva's preliminary hearing, Ruiz failed to identify Villanueva and testified that he did not see the face of the shooter. At a subsequent court hearing, Ruiz similarly failed to identify Villanueva as the shooter, but at an elevator immediately after the hearing, Ruiz told Detective Frettlohr that he did in fact recognize Villanueva, stating, "[T]hat's fucking him."

b. <u>Lori Martinez's identification</u>

Martinez described the shooter as a Hispanic male who wore a hoodie. She estimated the shooter to be 6 feet tall and approximately 170 pounds. Unlike Ruiz, Martinez believed the shooter held the handgun in his left hand before he lifted his arm and clasped his hands together to begin shooting.

When Detective Frettlohr provided her with a six-pack of photographs, Martinez quickly pointed to photograph number 6, a person who had no relevance to the case. Martinez believed that person looked "creepy." Asked whether she had looked at all of the photographs closely, Martinez examined all of them before also selecting Villanueva's photograph. Martinez believed that both of the photographs looked like the shooter, but felt the shooter looked more like photograph number 6.

3. <i>Gang evidence</i>

Both Los Angeles Police Department Officer Julian Gonzalez and Detective Angel Gomez opined that Villanueva was a member of the Culver City 13 gang. When Officer Gonzalez arrested Villanueva and another member of Culver City 13 in 2014, Villanueva admitted his membership in the gang and said he was known as Goofy. Additionally, Villanueva had tattoos

4

that identified him as a member of Culver City 13. Having seen Villanueva on a number of occasions between 2014 and 2016, Officer Gonzalez noticed that he was often in the presence of Kenneth Godoy, another member of Culver City 13.

Culver City 13 had about 260 members and operated in a territory that shared the Centinela Avenue border with rival gang Venice 13. At the time of his death, victim Gonzales was a member of the Venice 13 gang and was known by the name "Mono." He had a number of tattoos that reflected his gang affiliation.

Approximately one week after the death of Gonzales, some graffiti was placed in several locations that referenced the homicide. At one location, which was inside Venice 13 territory—and just a block away from the place where the shooting occurred—the graffiti stated, "Rest in piss . . . Mono" with the word "Mono" crossed out. At another location, a construction site in Culver City 13 territory, a Culver City 13 tagger took credit for the killing by using the derogatory term "Verga killer."

4.  *Arrest of fellow gang member Kenneth Godoy*

On February 12, 2016, Villanueva's friend and fellow gang member, Kenneth Godoy, was pursued and arrested after deputies observed him abandon a bucket that contained a handgun.[1] Godoy later called his wife, Monica Soto, from jail. During the recorded call, Soto told Godoy that she had been looking for him with Villanueva who was known to her as "Astro."

In August of 2016, after Godoy was arrested on another matter, Soto went to the police station and initiated a conversation with Detective Gomez in which she requested that

---

[1] The gun was not tied to the killing of Gonzales.

Godoy be released in exchange for information about a murder. When the detective asked for more specifics, Soto said that it was a shooting that involved Villanueva and occurred in the Oakwood-Venice area.

Using her cell phone, Soto played a 30-second recording of a conversation that she had had with Villanueva. Detective Gomez testified the voices on the recording sounded like Soto and Villanueva. He heard a portion in which Soto asked Villanueva how he knew the person was dead; Villanueva replied he went back to the crime scene, saw that it was taped off, and saw that the victim's girlfriend was crying.

Upon being told that Godoy would not be released, Soto left without giving the detective a copy of the recording.

     5.     *Arrest of Soto and her statement that Villanueva confessed to the instant shooting*

In late March of 2017, Soto and her previous conversation with Detective Gomez came to the attention of investigating Detective Frettlohr after Detective Gomez was transferred into his division.

Soto was arrested on an outstanding warrant and, in a recorded interview conducted by two detectives, said that Villanueva told her that he was responsible for the murder. Although Soto told the detectives about Villanueva's admission, she repeatedly said she would not testify because she feared for the safety of her family.

After stating that she no longer possessed the recording she previously played for Detective Gomez, Soto discussed an interaction that she had had with Villanueva on the day of Godoy's arrest in February of 2016. According to Soto, Villanueva called her and said that he had run from the police

6

and was unable to locate Godoy. Soto drove to Villanueva's location and picked him up to look for Godoy.

As they drove around looking for Godoy, Villanueva told Soto that he shot a man in Venice and that a girl near the victim screamed. Villanueva told Soto, "[T]hey're killing us, so we have to kill them too."

Soto explained that she used her cell phone to record some of her conversation with Villanueva because she was concerned that Godoy could be blamed for the homicide. Soto acknowledged that she attempted to make use of that recording after Godoy was arrested.[2]

6.      *Villanueva's arrest and search of his home*

On March 24, 2016, Villanueva was arrested at his home in Los Angeles. He was wearing a T-shirt, the back of which had a photograph of Tommy Luna—a Culver City gang member believed to have been killed by someone from Venice 13 prior to the charged homicide.

Detectives searched Villanueva's home and found some Culver City 13 graffiti and clothing commonly worn by members of the gang. The home's garage contained a .45-caliber Glock handgun that could not have been used to commit the charged homicide. Although the garage did not contain any other guns, it did contain two fully loaded magazines of .40-caliber bullets, which was the same caliber used to kill Gonzales. Detectives also recovered Villanueva's cell phone during the search.

---

[2] At trial, Soto testified that she lied to police when she told them that Villanueva had admitted to the shooting. She further testified that what she told police about the murder she learned from a Google search.

7

7.     *Cellular data from Villanueva's phone*

Cell tower information supported an inference that Villanueva's phone traveled from his home toward the scene of the shooting on the evening of the murder.[3]

Cell tower information also placed Villanueva's phone in the same area as Godoy at the time of Godoy's arrest in February of 2016. Other information showed that the very same day, Villanueva's phone was used to call Soto's phone before Godoy used the phone at jail to speak with Soto.

8.     *Villanueva's conversation with undercover jailhouse informant*

After his arrest Villanueva was placed in a jail cell with a civilian undercover informant—a Hispanic male who was a former gang member. Before putting Villanueva in the cell, Villanueva was told he was under arrest for murder, that his "homies" were talking about him, that witnesses had identified him, and that the police had his phone records. Villanueva was not told that a Venice 13 gang member was killed, where the murder occurred, or any details about the victim or shooting. Villanueva was put in the cell and sat on the top bunk while the agent was on the bottom bunk.

During the recorded conversation, Villanueva told the informant that he was a member of the Culver City gang. Villanueva said that there was a rivalry between his gang and Venice 13, with the two gangs frequently shooting at each other. He claimed that Culver City 13 was winning because Tommy Luna was the only person from his gang who had been killed.

---

[3] Surveillance video from the intersection of Flower Avenue and 7th Avenue at the time of the shooting was poor quality, but showed the shooting occurred at 8:11 p.m.

8

Although Villanueva repeatedly told the undercover informant that he had not committed the charged murder, the denials were often accompanied by laughter. Moreover, Villanueva made a number of statements during the conversation that suggested he was responsible for the homicide.[4]

About 45 minutes into the interview, detectives removed Villanueva from the jail cell and told him the murder had occurred in January 2016, that Godoy had stated Villanueva was involved, and they showed him Ruiz's six-pack identification.

After Villanueva returned to his cell, he told the informant that his "homie" was not with him and only knew "hearsay." Villanueva also showed that he knew the homicide occurred at night as he attempted to discount the significance of any eyewitness identification by stating, "It was nighttime, though."

_____

[4] Villanueva indicated that the guns he hid inside his home when the police arrived were "different ones" than the "shit" he used to "put in some work." Villanueva subsequently said, "I'm good" after the informant said, "As long as they [the police] don't find your murder weapon, nigga, you good." Later, when the informant asked what caliber of gun he used when he "broke that fool," Villanueva replied that he did not know and that it was "long gone." Villanueva also said that the proper way to dispose of a gun was piece by piece. Additionally, when the informant asked Villanueva whether he had any "homies" who could "tell" on him, Villanueva initially said, "No," before stating, "Just the little youngsters, and that's it." Villanueva later agreed with a suggestion that he needed to find out who was "telling" on him. Villanueva described the case against him as weak and explained that the person who was telling on him would not "want to come up because they didn't see shit." Villanueva then said, "Supposedly, there's one witness. I doubt that." When the informant asked if the "fool got done" in his neighborhood, Villanueva replied, "[i]n his hood."

Villanueva later said that the victim had not been alone when the shooting occurred.

### B. *Defense Evidence*

A defense investigator watched Villanueva sign some paperwork. Villanueva used his right hand to sign his name.

### C. *Charges and Verdict*

On May 8, 2017, the People filed a one count information charging Villanueva with first degree murder (Pen. Code, § 187, subd. (a)).[5] The information further alleged that Villanueva personally used a firearm that caused great bodily injury or death (§ 12022.53, subds. (b)-(d)) and that he committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)).

On November 20, 2019, a jury convicted Villanueva of first degree murder and found true allegations that the crime was gang related and that Villanueva personally and intentionally discharged a firearm, causing death.[6]

On January 30, 2020, the trial court sentenced Villanueva to a term of 25 years to life for the murder, plus a consecutive sentence of 25 years to life on the firearm enhancement, for a total term of 50 years to life in state prison.[7]

---

[5] All unspecified statutory references are to the Penal Code.

[6] The first trial resulted in a mistrial because that jury was unable to reach a verdict.

[7] The trial court struck the 10-year term for the gang enhancement, in light of the life term imposed for the underlying offense. (See *People v. Lopez* (2005) 34 Cal.4th 1002, 1009, 1011 [trial court must strike 10-year enhancement term specified in § 186.22, subd. (b)(1)(C) if underlying offense carries life term].)

## DISCUSSION

### I.    Statements Made to Undercover Agent

Villanueva contends the trial court erred by failing to suppress the recorded statements he made to the jailhouse informant. He claims to have asserted his right to remain silent while speaking to detectives outside of his jail cell. As a consequence, he claims that the police were prohibited from continuing the undercover operation under *Miranda v. Arizona* (1966) 384 U.S. 436. He also contends the statements he made to the informant were involuntary and thus admitted in violation of his due process rights.

Respondent counters that Villanueva made no clear invocation of his *Miranda* rights to detectives, that *Miranda* does not prohibit undercover jailhouse operations such as the one at issue here, and that any statements made by Villanueva were the product of his own free will rather than any coercion.

#### A.    *Relevant Facts*

After the first trial ended in a mistrial, the defense filed a renewed motion to suppress the statements Villanueva made to the informant on *Miranda* and voluntariness grounds. The parties stipulated to incorporating the record from the prior trial on the issue. The court indicated it would again deny the motion but would make a more complete record once it had reread the record from the prior trial.

The trial court thereafter concluded Villanueva had failed to make a clear invocation of his right to remain silent by telling Detective Frettlohr that he would not say anything but wanted to hear what the detective had to say. Later the trial court stated that the invocation question was irrelevant because it would not have precluded the continuation of the undercover operation. It

11

further found that Villanueva's statements were voluntary and not coerced.

## B.    *Villanueva's* **Miranda** *Claim Lacks Merit*

In *Illinois v. Perkins* (1990) 496 U.S. 292, 297, the United States Supreme Court held that a criminal suspect who makes incriminating statements is not entitled to *Miranda* warnings "when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." (*Perkins, supra,* at p. 294.)

Since *Perkins,* California courts have affirmed the principle that *Miranda* has no application to questioning when the suspect speaks to someone who is not a police officer or a known agent of police. (*People v. Tate* (2010) 49 Cal.4th 635, 685 [explaining that "*Miranda* protects the Fifth Amendment rights of a suspect faced with the coercive *combination* of custodial status *and* an interrogation *the suspect understands as official*"]; *People v. Mayfield* (1997) 14 Cal.4th 668, 758; *People v. Orozco* (2019) 32 Cal.App.5th 802, 814-816; *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1537-1541.)

In *Mayfield,* for example, the California Supreme Court held that the police did not violate *Miranda* when, after the defendant in custody had invoked his right to counsel, the officers allowed his father to discuss the case with him and then extracted a report of the conversation.

The court explained that the defendant's conversation with his own visitor was not the constitutional equivalent of police interrogation. In response to the defendant's claim that his father operated "as an unwitting or implied police agent," the court pointed out that the United States Supreme Court had previously held that " '[c]onversations between suspects and undercover agents do not implicate the concerns underlying

12

*Miranda.*' " (*People v. Mayfield*, *supra*, 14 Cal.4th at p. 758, quoting *Illinois v. Perkins*, *supra*, 496 U.S. at p. 296.)

Similarly, in *Orozco*, a defendant who was suspected of killing his own baby invoked his right to counsel. Following the invocation, officers encouraged the baby's mother to get an explanation before placing her with the defendant in an interview room with a hidden recording device.

After an officer interrupted the conversation to advise the couple that an autopsy showed the baby died from a beating, the defendant told the baby's mother that he caused the baby's death by striking her once. (*People v. Orozco*, *supra*, 32 Cal.App.5th at pp. 810-812.) On appeal, the reviewing court found no *Miranda* violation because "there is no 'interrogation' when a suspect speaks with someone he does not know is an agent of the police." (*Orozco*, *supra*, at p. 814.)

We need not decide whether Villanueva ever invoked his right to remain silent when police interrupted the undercover operation to speak with him. Under *Tate*, *Mayfield*, and *Orozco*, any such invocation would not have prohibited the resumption of undercover questioning.

### C. *Villanueva's Statements to the Informant Were Voluntary and Not Coerced*

We next address whether Villanueva's statements were "actually . . . coerced" (*Oregon v. Elstad* (1985) 470 U.S. 298, 310-311), and thus "involuntary." (*Dickerson v. United States* (2000) 530 U.S. 428, 444; see also *Arizona v. Fulminante* (1991) 499 U.S. 279, 285-286 & 287, fn. 3 [noting court has "used the terms 'coerced confession' and 'involuntary confession' interchangeably"].)

Due process precludes the admission of involuntary statements induced through coercive police tactics. (*People v.*

13

*Linton* (2013) 56 Cal.4th 1146, 1176.) " 'When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 404.)

Villanueva argues that the "sophisticated" tactics used during the *Perkins* operation rendered his statements involuntary. However, "[a] psychological ploy is prohibited only when, in light of all the circumstances, it is so coercive that it tends to result in a statement that is both involuntary and unreliable." (*People v. Mays* (2009) 174 Cal.App.4th 156, 164; see also *People v. McCurdy* (2014) 59 Cal.4th 1063, 1088 ["The use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement"].)

Villanueva believed that he was engaged in a conversation with a fellow gang member. The informant did not threaten Villanueva or take any action designed to overcome his free will. (Cf. *Arizona v. Fulminante*, *supra*, 499 U.S. at p. 288 ["fear of physical violence, absent protection from his friend (and [g]overnment agent) . . . motivated [the defendant] to confess"].) The repeated instances of laughter during the conversation further belie any suggestion that Villanueva's statements were the product of coercion.

The jailhouse tape recording of the conversation similarly refutes any suggestion by Villanueva that age differences played any role whatsoever in the interaction between him and the informant. *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199, cited by Villanueva, only mentions that, while "[d]eference to seniority could be a factor in some factual settings" the court "will

14

not embrace this theory as a universal principle based only on anecdotal speculation." The same is true here.

Accordingly, the trial court did not err in concluding that Villanueva's statements were voluntary and, therefore, admissible.

## II. CALCRIM No. 315

The trial court instructed the jury pursuant to CALCRIM No. 315, the standard Judicial Council instruction regarding eyewitness identification. The instruction directs the jury to consider a number of factors in evaluating eyewitness testimony, including the witness's level of certainty.[8] Villanueva argues the inclusion of this factor violates due process in light of the scientific studies showing little correlation between witness confidence and witness accuracy.

The Attorney General counters that the issue is forfeited by Villanueva's failure to seek modification of the instruction at trial, the claim must be rejected under California Supreme Court precedent, and any purported error was harmless in any event.

### A. *Relevant Law*

In *People v. Sánchez* (2016) 63 Cal.4th 411 (*Sánchez*), the California Supreme Court acknowledged that "some courts have disapproved instructing on the certainty factor in light of the scientific studies." (*Id*. at p. 462.) The court nevertheless declined to reexamine its previous holdings, explaining there

---

[8] CALCRIM No. 315 reads in relevant part: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] . . . [¶] How certain was the witness when he or she made an identification?"

15

were a number of identifications in the case, some certain and some uncertain, and it was not clear that courts in other states "would prohibit telling the jury it may consider this factor" as the defendant "would surely want the jury to consider how *uncertain* some of the identifications were." (*Ibid.*) The court also determined the instructional claim was forfeited for lack of objection, and the inclusion of the certainty factor resulted in no harm to defendant. (*Id.* at pp. 461-463.)

In a concurring opinion, Justice Liu agreed the claim was forfeited and any error was harmless, but urged the high court to reexamine the propriety of the instruction. (*Sánchez, supra*, 63 Cal.4th at pp. 495, 498 (conc. opn. of Liu, J.).)

In *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), our high court reexamined the propriety of CALCRIM No. 315, and concluded that inclusion of the certainty factor did not violate the defendant's due process rights. The court noted the instruction did not direct the jury that " 'certainty equals accuracy' " (*Lemcke, supra*, at p. 657), that the defendant was permitted to call an eyewitness identification expert who explained the limited circumstances when certainty and accuracy are positively correlated, and that the instruction expressly stated that the prosecutor must establish the defendant's identity as the perpetrator beyond a reasonable doubt. (*Id.* at pp. 654-661.) The court further noted that the defendant had the opportunity to cross-examine the investigating officers and explore any problematic aspects of the eyewitness identification procedures. (*Id.* at p. 660.)

In light of the significance witness certainty plays in the fact-finding process, however, the court referred the matter to the Judicial Council to evaluate how the instruction might be modified to avoid juror confusion on the issue. The court further

16

exercised its supervisory powers to direct trial courts, in the interim, to omit the certainty factor from the instruction unless a defendant requested otherwise. (*Lemcke*, *supra*, 11 Cal.5th at pp. 654-661.)

### B. *Villanueva's Claim is Forfeited*

Villanueva's trial was completed on November 20, 2019, well before the issuance of *Lemcke's* advisory admonition regarding CALCRIM No. 315 on May 27, 2021. He interposed no objection to that instruction below, and the trial court was under no obligation either to give or modify CALCRIM No. 315 on its own motion. (See *People v. Cook* (2006) 39 Cal.4th 566, 599 [no sua sponte duty to give standard instruction on eyewitness identification]; *People v. Ward* (2005) 36 Cal.4th 186, 213 [no sua sponte duty to modify the standard instruction on eyewitness identification].)

Like the defendant in *Sánchez*, Villanueva forfeited any objection to the court's instruction. (See *Sánchez*, *supra*, 63 Cal.4th at p. 461 ["If [the] defendant had wanted the court to modify the [certainty] instruction, he should have requested it. The trial court has no sua sponte duty to do so"].)[9]

---

[9] Even had the claim been preserved, we would find no prejudicial error. In both *Sánchez* and *Lemcke*, the court explained that the misleading effect of the instruction "is not present when a witness has expressed doubt regarding the identification." (*Lemcke*, *supra*, 11 Cal.5th at p. 669, fn. 19; *Sánchez*, supra, 63 Cal.4th at p. 462 ["telling [the jury] to consider this factor could only benefit [the] defendant when it came to the uncertain identifications, and it was unlikely to harm him regarding the certain ones"].) Both eyewitnesses in this case expressed significant uncertainty at various times in their identifications. And, as we have thoroughly discussed, the two eyewitnesses were far from the only evidence linking Villanueva

17

## III.  Cumulative Error

Villanueva contends the cumulative effect of the errors alleged above denied him due process and compels reversal.  In light of our disposition, there are no multiple trial errors to accumulate.  (*People v. Capers* (2019) 7 Cal.5th 989, 1017-1018.)

## IV.  Failure of Trial Court to Consider Imposing "Lesser Included" Firearm Enhancement

The jury found true the allegation that Villanueva personally and intentionally discharged a firearm causing death pursuant to section 12022.53, subdivision (d).

At sentencing, the trial court acknowledged it had discretion to strike the firearm enhancement pursuant to section 12022.53, subdivision (h),[10] but declined to do so.  The trial court noted that Villanueva fired off nine rounds and personally gunned down the victim without any provocation.  Accordingly, the trial court imposed the 25 years to life term for the enhancement.

---

to the crime.  In light of the overall record, we are confident that the inclusion of the certainty factor in this case did not result in prejudicial error.  (*Lemcke*, *supra*, at p. 661; *Sánchez*, *supra*, at p. 463.)

[10] Effective January 1, 2018, the Legislature enacted Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, § 2), which amended section 12022.53, subdivision (h), to grant courts discretion to "strike or dismiss" a firearm enhancement imposed under section 12022.53 " 'in the interest of justice pursuant to [s]ection 1385.' "  (*People v. Morrison* (2019) 34 Cal.App.5th 217, 221-222 (*Morrison*); see *People v. McDaniels* (2018) 22 Cal.App.5th 420, 428.)

Villanueva now asserts that the case must be remanded because the trial court was unaware it had the additional option to replace the section 12022.53, subdivision (d) enhancement with a " 'lesser included' " firearm enhancement under subdivision (b) or (c) as recognized in *Morrison*, *supra*, 34 Cal.App.5th at pp. 222-223.  We disagree.

In *Morrison,* the court concluded that, in addition to the discretionary ability to strike a section 12022.53 firearm allegation, courts also have "discretion to modify the enhancement from that established by section 12022.53, subdivision (d) . . . to a 'lesser included' enhancement under section 12022.53, subdivision (b) or (c), which carry lesser terms of 10 years or 20 years, respectively."  (*Morrison*, *supra*, 34 Cal.App.5th at p. 221.)[11]

A number of other courts have since disagreed with *Morrison*, and the issue is now before the California Supreme Court.  (*People v. Valles* (2020) 49 Cal.App.5th 156, 166-167, review granted July 22, 2020, S262757; *People v. Garcia* (2020) 46 Cal.App.5th 786, 790, review granted June 10, 2020, S261772; *People v. Yanez* (2020) 44 Cal.App.5th 452, 458-460, review granted Apr. 22, 2020, S260819; *People v. Tirado* (2019) 38 Cal.App.5th 637, 643, review granted Nov. 13, 2019, S257658.)

We need not join in the debate because we agree with the People that Villanueva has forfeited his claim by failing to raise the argument before the sentencing court.

---

[11] As in *Morrison*, the initial information in our case pled enhancements under section 12022.53, subdivisions (b), (c) and (d), but the jury was only given the option of finding true the subdivision (d) allegation.

" 'A party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial.' " (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1100, quoting *People v. Gonzales* (2013) 31 Cal.4th 745, 751; accord, *People v. Scott (*1994) 9 Cal.4th 331, 353.)

*Morrison* was decided on April 11, 2019. Villanueva was sentenced on January 30, 2020. Prior to pronouncing sentence, the court expressly directed the parties to present any arguments regarding the court's discretion under section 12022.53, subdivision (h) and stated it did not want the matter remanded back to the court for any aspect that may have been overlooked or forgotten. Notwithstanding, defense counsel requested no modification or reduction of the firearm-related penalty, but instead asked the court to strike the enhancement out of "mercy" for Villanueva.[12]

## V.    Presentence Custody Credits

Villanueva contends that he was entitled to 1,408 days of presentence custody credit. The Attorney General agrees, as do we. Villanueva was arrested on March 24, 2016, and was sentenced on January 30, 2020. Under California law, a criminal

---

[12] To the extent Villanueva relies on cases such as *People v. Billingsley* (2018) 22 Cal.App.5th 1076, 1077-1082 and *People v. Garcia* (2018) 28 Cal.App.5th 961, 971-973, to support his remand request, that reliance is misplaced. Absent evidence to the contrary, reviewing courts "presume that the trial court knew and applied the governing law." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390; accord, *Morrison, supra*, 34 Cal.App.5th at p. 225.)

defendant is entitled to credit for all days spent in custody from the day of arrest until the day of sentencing. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; *People v. Morgain* (2009) 177 Cal.App.4th 454, 469.) Accordingly, he is entitled to 1,408 days of presentence custody credit.

### DISPOSITION

The judgment is modified to reflect an award of 1,408 days of presentence custody credit. As modified, the judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment.

NOT TO BE PUBLISHED

CRANDALL, J.*

We concur:

ROTHSCHILD, P. J.

CHANEY, J.

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.