[No. A051892. First Dist., Div. Four. Dec. 20, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT P. GUILMETTE, Defendant and Appellant.

COUNSEL

Robert J. Graham, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Morris Beatus and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**REARDON, J.**—Appellant Albert P. Guilmette was sentenced to an aggregate state prison term of 25 years following his convictions of burglary, 2 counts of rape, assault with a deadly weapon, and false imprisonment, with weapon use enhancements and prior convictions being found true. He appeals, contending (1) that the trial court erred in admitting his postarrest telephone conversation with the victim and (2) that the trial court erred in failing to provide an adequate response to questions from the jury during deliberations.

## FACTS

During the early morning hours of January 16, 1990, appellant broke into the family home of his former girlfriend, Karen F., grabbed her from behind as she attempted to admit police who were responding to her earlier emergency telephone call, put a knife to her throat and threatened to kill her if she said anything. Karen was forced into her room at knifepoint by appellant.

After observing a broken window on a side door, receiving no response at the front door, and hearing "running [and] wrestling" inside, Sergeant Eskridge forced entry. He approached the closed door to Karen's room and announced, "Sheriff's Department." From inside the room, appellant responded, "Don't come in here. I'll kill her." Karen also stated, "Yeah, don't come in here. He's got a knife at my throat."

For the next four hours, appellant held Karen hostage. Efforts by police to negotiate with appellant were unsuccessful. During this time, appellant raped Karen twice. Appellant finally surrendered by leaving the room at approximately 6:37 a.m.

Appellant testified at trial. His version of the events was substantially different from that of the victim's. He admitted prying open a window with a knife to make entry, but explained that the reason for his entry was a fear that the victim had overdosed on drugs. When he heard the police at the front door, he became concerned because he was in possession of cocaine. Karen grabbed his hand and they ran down the hall to the bedroom. He testified that both he and Karen were under the influence of drugs and that the sexual activity was consensual.

## DISCUSSION

A. *Admissibility of Appellant's Postarrest Conversation With the Crime Victim*

 Appellant contends that the trial court erred in admitting his post-arrest statements made during the course of a telephone conversation with the victim. It is contended that the victim was acting as a police agent at the time of the conversation and that appellant had previously invoked his *Miranda*[1] rights.

The facts relating to this contention are essentially undisputed. Following his arrest, appellant was transported to the sheriff's substation in San Leandro. There, Sergeant Eskridge contacted appellant and advised appellant of

---

[1]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

his *Miranda* rights. Eskridge testified that according to his report, appellant invoked his right to remain silent and to the presence of an attorney during questioning.

Shortly thereafter, appellant asked Eskridge to make a phone call for him. Eskridge agreed, dialed the number that appellant provided, and gave the receiver to appellant. Eskridge was then informed by appellant that "the people would not accept the collect call." This procedure was repeated, with the same number being dialed by Eskridge at appellant's request and with the same result. It was not until after this second call that Eskridge realized that the number being dialed was that of the victim's residence. When appellant made a third request, he was informed by Eskridge that there should be no contact with the victim.

Without any knowledge of the foregoing events, Deputy Alley responded to the Ferguson residence on the basis of a radio dispatch concerning annoying or threatening phone calls. When he arrived, Alley was informed by the victim's father that collect calls had been received from appellant, which calls the family had declined to accept. Alley was also told by either Karen or her father that appellant was in jail because of crimes committed at the home earlier in the day. Karen told Alley that she wanted the calls stopped. Alley advised Karen that the only way to stop the calls was to speak with appellant. Karen agreed and a taperecording device was affixed to the phone.

Initially, no phone calls were received. Alley then called the jail at Santa Rita, learned that appellant was now housed in an area without access to a telephone, and instructed jail personnel to move appellant to a location where there would be phone access. Shortly thereafter, the telephone rang and it was appellant calling.

The ensuing conversation can best be described as an attempt by appellant to dissuade Karen from testifying against him. Some statements by appellant were made in response to questions suggested by Alley or his partner. Some statements by appellant were in response to questions asked independently by Karen. Some statements by appellant were simply volunteered and were not made in response to any question.

The positions espoused by the respective parties have been well briefed and are relatively straightforward. Appellant argues that the tape-recorded conversation was erroneously admitted because the evidence was the product of custodial interrogation, appellant had previously invoked his *Miranda* rights, and those rights were never waived by him. The Attorney General

concedes that there was sufficient evidence to support the trial court's conclusion that Karen was acting as a police agent at the time of the challenged conversation. Citing *McNeil* v. *Wisconsin* (1991) 501 U.S. __ [115 L.Ed.2d 158, 111 S.Ct. 2204] and *Arizona* v. *Roberson* (1988) 486 U.S. 675 [100 L.Ed.2d 704, 108 S.Ct. 2093], it is also conceded that if a *Miranda* violation occurred, the entire conversation should have been excluded. The Attorney General maintains, however, that appellant's statements to Karen were not the product of custodial interrogation within the meaning of *Miranda* and that a prior invocation of rights, therefore, cannot serve to bar admissibility.

The *Miranda* rule is designed to protect and preserve an accused's Fifth Amendment[2] privilege against self-incrimination during "incommunicado interrogation of individuals in a police-dominated atmosphere . . . ." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 445 [16 L.Ed.2d at p. 707].) As stated by the *Miranda* court, such an atmosphere tends to generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." (*Id.*, at p. 467 [16 L.Ed.2d at p. 719].) "It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation. . . . When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners." (*Illinois* v. *Perkins* (1990) 496 U.S. 292, 297 [110 L.Ed.2d 243, 251, 110 S.Ct. 2394, 2397].)

In *Perkins*, the United States Supreme Court held that a conversation between an incarcerated suspect and an undercover agent posing as a fellow inmate did not implicate the concerns underlying *Miranda*. The court's ruling was clearly articulated: "We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent. Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist. The State Court here mistakenly assumed that because the suspect was in custody, no undercover

---

[2]It is important to observe that we are not herein confronted with an alleged Sixth Amendment violation because appellant was not formally charged at the time of the conversation with Karen. (See *Kirby* v. *Illinois* (1972) 406 U.S. 682 [32 L.Ed.2d 411, 92 S.Ct. 1877]; cf. *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183]; *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199].) Our discussion, therefore, is limited to a Fifth Amendment analysis, i.e., whether the questioning was violative of *Miranda* and its progeny. (See *United States* v. *Gouveia* (1984) 467 U.S. 180, 188, fn. 5 [81 L.Ed.2d 146, 154, 104 S.Ct. 2292].)

questioning could take place." (*Illinois* v. *Perkins*, *supra*, 496 U.S. at p. 297 [110 L.Ed.2d at p. 251].)

A similar result has been reached by our highest court. In *People* v. *Williams* (1988) 44 Cal.3d 1127 [245 Cal.Rptr. 635, 751 P.2d 901], the court found that *Miranda* "has never been applied to conversations between an inmate and an undercover agent." (*Id.*, at pp. 1141-1142.) The reason why *Miranda* has no application to this type of conversation is because "*Miranda* warnings serve to dispel the coercive effect of *police custodial* questioning" (*id.*, at p. 1142, italics in original) and "[w]hen a defendant talks to a fellow inmate, the coercive atmosphere of custodial police interrogation is absent." (*Ibid.*) The *Williams* court concluded that "the conversations between Oglesby [police agent] and defendant did not take place in a setting in which *Miranda* warnings were required, and thus introduction of those conversations into evidence did not violate defendant's Fifth Amendment rights. [Citations.]" (*Ibid.*)

 One would be hard-pressed to characterize appellant's conversation with Karen as "police custodial" interrogation as defined in *Miranda* and as construed by subsequent decisions, and equally hard-pressed to distinguish the setting or atmosphere of the conversation from those in *Perkins* and *Williams*. Here, appellant initiated the telephone contact and sought conversation with the crime victim. He was not forced to speak with the victim and, in fact, had been admonished by Eskridge not to do so. In speaking with Karen, appellant did not know of any police involvement in the taping of the conversation or in some of the questions asked by Karen. "Where the suspect does not know that he is speaking to a government agent there is no reason to assume the possibility that the suspect might feel coerced." (*Illinois* v. *Perkins*, *supra*, 496 U.S. at p. 299 [110 L.Ed.2d at p. 252].) Since appellant was not forced to contact the victim and since he did not know that Karen was acting as a police agent, there was no "police-dominated atmosphere" (*Miranda* v. *Arizona*, *supra*, 384 U.S. at p. 445 [16 L.Ed.2d at p. 707]), there were no "inherently compelling pressures" (*id.*, at p. 467 [16 L.Ed.2d at p. 707]), and there was no "coercive atmosphere" (*Perkins*, *supra*, at pp. 296-297 [110 L.Ed.2d at p. 251]). In fact, if there was a coercive atmosphere, it was created entirely by appellant through his efforts to dissuade Karen from testifying.

In short, there is nothing about the challenged conversation that implicates *Miranda*. (See *Perkins*, *supra*; *Williams*, *supra*.)

Appellant contends, however, that his prior invocation of rights made to Eskridge somehow converts an unprotected conversation into a protected

one under *Miranda*. Relying upon *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880], and related cases, appellant argues that his invocation of *Miranda* rights forever barred further police questioning. In light of *Perkins* and *Williams*, we must conclude that appellant's reliance on the *Edwards* rule is misplaced.

■ *Edwards* clearly prohibits "further interrogation" of an accused after *Miranda* rights have been invoked "unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards* v. *Arizona, supra*, 451 U.S. at pp. 484-485 [68 L.Ed.2d at p. 386].) The "interrogation" prohibited by *Edwards* means "custodial interrogation." "Absent 'custodial interrogation,' *Miranda* simply does not come into play. [Citations.] . . . . Hence, if 'custodial interrogation' is lacking, *Miranda* rights are not implicated and there is consequently 'no occasion to determine whether there ha[s] been a valid waiver.' (*Edwards* v. *Arizona, supra*, at p. 486.)" *People* v. *Mickey* (1991) 54 Cal.3d 612, 648 [286 Cal.Rptr. 801, 818 P.2d 84].) *Edwards*, therefore, does not prohibit all questioning by police but rather questioning that constitutes under *Miranda* "custodial interrogation." The police may not resume "custodial interrogation" unless and until there is compliance with *Edwards*.

■ Having previously determined that what transpired between appellant and Karen was not "custodial interrogation" protected under *Miranda*, there is "no occasion to determine whether there ha[s] been a valid waiver" (*Edwards* v. *Arizona, supra*, 451 U.S. at p. 486 [68 L.Ed.2d at p. 387]) and the fact that the conversation occurred after an invocation of rights is without legal significance. (See *People* v. *Mickey, supra*.)

Finally, we find appellant's argument that *Perkins* is inapplicable to be unpersuasive. It is true, as appellant contends, that in *Perkins* there was no *Miranda* warning, no invocation of *Miranda* rights, and that the issue presented to the court was whether the undercover agent was required to give Perkins a *Miranda* warning. These distinguishing facts, however, do not change or alter the basic nature of the respective conversations by Perkins and appellant herein. Each voluntarily communicated with a person not known to be a police agent. ■ "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust . . . ." (*Perkins, supra*, 496 U.S. at p. 297 [110 L.Ed.2d at p. 251].) Statements made under these circumstances simply do not implicate *Miranda*, and a noncoercive atmosphere is not transformed into a coercive one because one suspect is warned and the other is not.

The purpose of *Miranda* is to prevent coercive custodial interrogation and that purpose is not advanced by excluding from evidence statements made

by a suspect who voluntarily contacts the crime victim who, unknown to the suspect, is acting as a police agent. There being no violation of *Miranda*, appellant's statements made during the course of the conversation were properly admitted by the trial court.

B. *The Adequacy of the Trial Court's Responses to Questions From the Jury*

■ Appellant next contends that the trial court erred in failing to provide an adequate response to two questions asked by the jury during deliberations. It is not contended that there was error in the instructions given but that the court failed to provide adequate assistance.

The record reflects that the trial court, in its instructions to the jury, correctly defined the term "used a deadly weapon" as meaning "to display a deadly weapon in a menacing manner, intentionally to use it, or intentionally to strike or hit a human being with it." (See CALJIC No. 17.19.1; *People* v. *Chambers* (1972) 7 Cal.3d 666 [102 Cal.Rptr. 776, 498 P.2d 1024].) During deliberations, the jury first inquired "What is the deffinition [*sic*] of use in referring to using the knife in the commission of rape?" The court responded to this question by referring the jury to the above instruction. The next day, the jury asked: "In deffinition [*sic*] of use of a deadly weapon does the term displayed mean physically visible or does some other interpretation apply. If so what does it mean." The court responded that the "term is self explanatory" and referred the jury again to the instruction previously given defining the terminology "used a deadly weapon."

■ In responding to questions from a jury during deliberations, the trial judge has authority to provide clarifying instructions if appropriate. (*People* v. *Thompkins* (1987) 195 Cal.App.3d 244 [240 Cal.Rptr. 516].) However, "[t]his does not mean the court must always elaborate on the standard instructions. . . . Indeed, comments diverging from the standard are often risky." (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].)

■ With respect to the first jury question asking for a definition of use of a deadly weapon, the court's response referring the jury to the definition previously given was entirely appropriate. Concerning the second question which essentially asked whether "displayed" meant to be physically visible, the answer to that question was also contained in the instruction previously given, i.e., "to display a deadly weapon *in a menacing manner.*" (Italics added.) Referring the jury to that instruction was, again, entirely appropriate. The fact that the jury found no use of a deadly weapon in connection with

the second rape, which finding was apparently based upon the conclusion that the victim could not actually see the knife at that particular time, tends to suggest that the trial court's response in fact assisted the jury.

We find no error in the trial court's responses to the jury.

### CONCLUSION

The judgment of conviction is affirmed.

Anderson, P. J., and Perley, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 19, 1992.