Filed 12/17/24  P. v. Gonzalez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANNY GONZALEZ,<br><br>    Defendant and Appellant. | B329962<br><br>Los Angeles County<br>Super. Ct. No. TA153731 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sean D. Coen, Judge.  Affirmed.

Judith Kahn and Olivia Meme, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Juries convicted Danny Gonzalez of first degree murder and unlawful possession of a firearm.  On appeal, Gonzalez argues the trial court erred by admitting into evidence incriminating statements he made to undercover agents as part of a *Perkins*[1] operation.  Gonzalez asserts, because he made the statements after having invoked his right to counsel, the court should have excluded the evidence as in violation of *Miranda*.[2]  Gonzalez also argues the case must be remanded for resentencing so the trial court may consider whether to strike a prior strike and select a lower term for a firearm enhancement. We reject Gonzalez's arguments and affirm.

**FACTS AND PROCEDURAL BACKGROUND**

The People charged Gonzalez with the first degree murder of Andres Cardenas (Pen. Code, §§ 187, subd. (a), 189, subd. (a)),[3] the first degree murder of Marc Garcia (*ibid*.), and unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1)). The People alleged Gonzalez personally used a firearm in the commission of the Garcia murder (§12022.5, subd. (a)) and has a prior robbery juvenile adjudication that qualifies as a strike (§ 211).  The People also alleged various aggravating circumstances.

1. ***The trials***

The case first went to trial in late 2022.  The People's theory of the case was that Gonzalez murdered the victims— Garcia and Cardenas—in retaliation for the killing of his cousin,

---

[1]     *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[3]     Statutory reference are to the Penal Code.

Antonio Banda. In support of that theory, the People presented evidence that Garcia and Cardenas were present when someone shot and killed Banda in July 2017. Gonzalez and Banda were very close, and Gonzalez was devastated by Banda's death.

Gonzalez attended a rosary for his deceased cousin on August 5, 2017. At some point that day, Gonzalez learned Garcia and Cardenas were staying at a nearby motel. A man with the moniker Thief drove Gonzalez to the motel in a stolen car. Thief had a revolver and Gonzalez had two guns, an AR-15 rifle and a nine-millimeter handgun.

Gonzalez saw the victims as he and Thief drove up to the motel. Gonzalez fired a gun twice to let the victims know he was there. The victims started running in different directions. Gonzalez chased after Garcia. Garcia tried to hop over a fence, and Gonzalez shot him a number of times.

Thief was supposed to stay in the car, but instead he got out and chased after Cardenas. Cardenas ran into the motel lobby and started pounding on a locked door, yelling to be let inside. Thief followed Cardenas and shot him.

Thief and Gonzalez got back into their car and drove away. Garcia and Cardenas died from their wounds.

Gonzalez's counsel conceded he shot and killed Garcia, but argued he did so in the heat of passion. Counsel asserted Gonzalez had nothing to do with killing Cardenas.

The jury found Gonzalez guilty of unlawful possession of a firearm and not guilty of murdering Cardenas. The jury could not reach a verdict on the Garcia murder count, and the court declared a mistrial.

The People retried the Garcia murder count in March 2023. The court bifurcated the prior strike and aggravating

circumstances allegations. On the murder count, the People presented evidence establishing the facts summarized above. This time, the jury convicted Gonzalez of first degree murder and found the firearm allegation to be true. The court excused the jurors before they could consider the aggravating circumstances allegations.

Gonzalez waived his right to a jury trial on the prior strike allegation. He admitted the allegation, and the court found it to be true.

## 2. *Sentencing*

At the sentencing hearing, Gonzalez asked the court to strike the prior strike, arguing he was a minor when he committed the crime and it was remote in time. Gonzalez asserted the court could impose no more than the midterm on the felon in possession count and the firearm enhancement given the jury did not make any findings on the aggravating circumstances allegations.

The court declined to strike the prior strike, concluding Gonzalez still falls within the spirit of the Three Strikes law. The court noted that Gonzalez was 17 years old when he committed the robbery, the crime was not so remote in time, and Gonzalez had committed other crimes after the adjudication.

The court sentenced Gonzalez to an aggregate term of 10 years plus 50 years to life. The sentence consisted of 25 years to life for the Garcia murder, doubled for the prior strike, plus the high term of 10 years for the firearm enhancement. The court imposed the midterm of two years on the felon in possession count, which it ran concurrent with the life term.

Gonzalez timely appealed.

**DISCUSSION**

**1.** *The trial court properly admitted the* **Perkins**
   *evidence*

Gonzalez argues the trial court erred by denying his motion
to exclude statements he made to undercover agents as part of
a *Perkins* operation. He contends his conversation with the
agents was an interrogation subject to *Miranda*'s requirement
that officers not engage in custodial interrogation after a suspect
has invoked his right to counsel. He argues, because he invoked
his right to counsel before the *Perkins* operation began, the court
should have excluded all his statements to the agents.[4]

   a.     *The* Perkins *operation*

After arresting Gonzalez, the police placed him in a cell
with two undercover government agents as part of a *Perkins*
operation. The agents introduced themselves with their
monikers and gang affiliations. Gonzalez responded with the
same. One of the agents said he knew Gonzalez's brother-in-law.
According to the agent, the brother-in-law did termite work
at the agent's grandmother's house and treated her well.

The agents presented themselves as being older and more
experienced than Gonzalez. One of the agents said he had served

---

[4]     We reject the Attorney General's contention that Gonzalez
forfeited these arguments. The Attorney General asserts
Gonzalez challenged the *Perkins* evidence in the trial court only
on state law grounds, which forfeited any federal-law arguments.
The record, however, belies this claim. Gonzalez expressly and
repeatedly argued admission of the *Perkins* evidence would
violate *Miranda*, a case the United States Supreme Court decided
on federal constitutional grounds. (See *Miranda, supra*, 384 U.S.
at p. 439.)

17 years in prison and had previously been charged with three murders. The agent asked Gonzalez if he knew "what's going on" in county jail. Gonzalez said he had not been in jail since 2013. The agent responded that "all kinds of shit changed. Look, the homies wanna know what's up." The agent continued, "They'll ask like, 'Homeboy, what's up with homeboy?' "

The agents said they were hoping to receive favorable plea deals, and Gonzalez asked them what sort of a deal he could expect. The agents said it depends on the specifics of his case. Gonzalez started to talk in a whisper, telling the agents the police found his cell phone in a stolen vehicle. An agent suggested there was no need to whisper because the police must give some sort of a signal when they are listening to a conversation.

The agents asked Gonzalez about his case, but Gonzalez was hesitant to provide details. One of the agents said Gonzalez was making him nervous, implying Gonzalez might be an informant. Gonzalez replied that he did not feel comfortable talking. The agent reiterated that, under the law, the police must give some sort of a sign that they're listening to a conversation.

After this reassurance, Gonzalez admitted killing Garcia in revenge for his cousin's death. Gonzalez said he had been searching for Garcia for three weeks. His "homie Thief" "got word" that Garcia was at the motel. Gonzalez had a stolen car ready to use and told Thief, "[L]et's go."

Thief drove the car, Gonzalez was in the backseat, and another man was keeping watch along the street. Thief had a revolver and Gonzalez had two guns, an AR-15 rifle and

a nine-millimeter handgun.  Gonzalez thought the police might show up, and he was going to "let [the police] have it."  Gonzalez was "ready for war."

When they arrived at the motel, Gonzalez got out of the car and chased after Garcia.  Thief was supposed to stay in the car, but he instead chased Cardenas into the lobby.  Gonzalez shot 30 bullets at Garcia using an AR-15 rifle.  Gonzalez "left that fool hanging on the fence with no face."  He did it "for [his] family."  Gonzalez felt good afterwards, but not too good because his cousin was still dead.

 b. *Proceedings below*

Before the first trial, defense counsel told the court that Gonzalez had invoked his right to counsel while the police were interrogating him.  The police did not immediately end the interrogation.  Instead, they asked Gonzalez whether they would find weapons in his home.  Gonzalez replied, " 'Probably.' "  The police then ended the interrogation and placed Gonzalez in the cell with the *Perkins* agents.

Gonzalez moved to exclude all of the statements he made after invoking his right to counsel, including his statements during the *Perkins* operation.  According to Gonzalez, his statements to the agents should be excluded as the tainted fruit of the *Miranda* violation.  Gonzalez distinguished *Perkins* on the ground that the defendant in that case made the incriminating statements before invoking his rights under *Miranda*.  Gonzalez, in contrast, made the statements after invoking his right to counsel.

Gonzalez argued his statements to the agents also should be excluded because they were coerced.  He pointed to the agents' lies that the police could not listen to their conversation without

7

providing some sort of signal.  Gonzalez also pointed out that the agents noted his relative youth and claimed to know his brother-in-law.

The prosecutor agreed that Gonzalez's statements to police after invoking his right to counsel should be excluded under *Miranda.*  However, the prosecutor argued *Miranda* did not apply to Gonzalez's conversation with the *Perkins* agents.

The court agreed with the prosecutor and denied Gonzalez's motion to exclude his statements during the *Perkins* operation. The court rejected Gonzalez's fruit of the poisonous tree argument, citing *People v. Orozco* (2019) 32 Cal.App.5th 802 (*Orozco*).  The court found Gonzalez made the statements of his own free will, rather than through intimidation or coercion.

Gonzalez raised the same objections before the second trial. He again urged the court to exclude the *Perkins* evidence in its entirety as a violation of *Miranda* and the product of coercion. In support of his coercion argument, Gonzalez pointed out that the agents lied about the conversation being recorded, commented on Gonzalez's youth, told him " 'homies are gonna want to know what's up,' " and claimed to have beat prior murder cases.  The court overruled the objections, concluding the conversation with the agents was not coercive in any way.

At both trials, the prosecutor played excerpts of a recording of Gonzalez's conversation with the agents.

c.     *Application*

In *Perkins*, the United States Supreme Court held a conversation between an incarcerated suspect (who had not been given *Miranda* warnings) and an undercover agent posing as a fellow inmate was not custodial interrogation, and therefore did not require warnings under *Miranda.*  (*Perkins, supra,* 496

8

U.S. at pp. 294, 296–297.)  The court explained, "It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation. . . .  When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners." (*Id.* at p. 297.)  Although custodial questioning by a suspect's captors who appear to control the suspect's fate may create "mutually reinforcing pressures" weakening the suspect's will, "where a suspect does not know that he is conversing with a government agent, these pressures do not exist." (*Ibid.*)  "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." (*Id.* at pp. 297–298.)

Gonzalez argues *Perkins* does not apply because he made the incriminating statements after he had invoked his right to counsel.  However, as Gonzalez seems to acknowledge, California courts have repeatedly and uniformly rejected this argument.  (See *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1540–1541 (*Guilmette*); *People v. Plyler* (1993) 18 Cal.App.4th 535, 544–545; *Orozco, supra*, 32 Cal.App.5th at pp. 813–815; *People v. Felix* (2024) 100 Cal.App.5th 439, 450–451 (*Felix*).)

In *Guilmette, supra*, 1 Cal.App.4th 1534, for example, the defendant had invoked his right to remain silent and his right to an attorney before police recorded a phone call he made to his rape victim, who was acting as a police agent and asking questions suggested by the police.  (*Id.* at p. 1538.)  The court held the recording was admissible under *Perkins*, regardless of the defendant's earlier invocation of his *Miranda* rights.  The court explained, "It is true, as appellant contends, that in *Perkins*

9

there was no *Miranda* warning, no invocation of *Miranda* rights, and that the issue presented to the court was whether the undercover agent was required to give Perkins a *Miranda* warning. These distinguishing facts, however, do not change or alter the basic nature of the respective conversations by Perkins and appellant herein. . . . Statements made under these circumstances simply do not implicate *Miranda*, and a noncoercive atmosphere is not transformed into a coercive one because one suspect is warned and the other is not." (*Guilmette*, at p. 1541.)

Division Two of this appellate district agreed in *Orozco, supra*, 32 Cal.App.5th 802. In that case, the defendant's baby had died of blunt trauma while under his care. The police read the defendant his *Miranda* rights and eventually jailed him after he continuously asked for an attorney. (*Orozco*, at pp. 806–808.) The police put the baby's mother in an interview room with the defendant and recorded their conversation. An officer interrupted to report autopsy results indicating the baby had died from a beating and asked the parents if they had anything to say in response. (*Id*. at pp. 808–809.) The defendant was silent. Sometime after the officer left, the defendant broke down and confessed to the mother that he struck the baby once and it killed her. (*Id*. at p. 809.)

The defendant moved to suppress his confession as a violation of *Miranda*, but the trial court allowed the confession into evidence, citing *Perkins*. (*Orozco, supra*, 32 Cal.App.5th at p. 810.) On appeal, the defendant argued his confession should have been suppressed because he invoked his *Miranda* right to counsel, and the police violated *Miranda* when they sent the baby's mother (who was an agent of the police) to speak to him.

10

(*Orozco*, at p. 812.)  The appellate court disagreed.  The court explained that a suspect who has invoked his right to counsel may not be subjected to further interrogation, which requires the suspect to be aware he is interacting with the police or an agent of the police.  (*Id.* at pp. 813–814.)  Because the defendant did not realize the baby's mother was an agent of the police, there was no interrogation.  Nor did the conversation involve the type of compelling psychological pressures that *Miranda* aimed to dispel.  (*Orozco*, at p. 814.)

Division Eight of this appellate district recently reached the same conclusion in *Felix, supra*, 100 Cal.App.5th 439.  In *Felix*, the police arrested the defendant in connection with two murders.  (*Id.* at p. 443.)  After the defendant invoked his right to counsel, the police concluded their interrogation and placed the defendant in a holding cell with an undercover officer.  The defendant told the undercover officer about his arrest, but he did not talk about the murders.  At some point, uniformed detectives took the defendant out of his cell and told him they had received evidence pointing to his involvement in a murder.  The police returned the defendant to his cell, and he made incriminating statements to the undercover officer about the murders.  (*Id.* at pp. 443–444.)

The defendant moved to exclude his statements to the undercover officer, which the trial court denied.  (See *Felix, supra*, 100 Cal.App.5th at p. 450.)  On appeal, the defendant argued his statements should have been excluded under *Miranda* because he made them after invoking his right to counsel.  The court disagreed, concluding the statements were admissible under *Perkins*.  (*Felix*, at p. 450.)  The court explained that, during his conversation with the undercover officer, the

11

"defendant was not subjected to coercive interrogation of the type of which *Miranda* was concerned.  The incriminating statements he freely made to someone he believed to be a fellow inmate were properly admitted."  (*Id*. at p. 451.)

As in *Guilmette, Orozco*, and *Felix*, the record here shows Gonzalez made the incriminating statements without realizing he was talking to agents of the police.  Instead, he believed he was having a private conversation with fellow inmates.  In fact, Gonzalez opened up to the agents only after they repeatedly assured him the police could not listen to their conversation.

The record also shows Gonzalez made the statements of his own free will, rather than as a product of coercion.  The discussion turned to Gonzalez's case only after he asked the agents what sort of a plea deal he could expect.  Although the agents questioned Gonzalez about the specifics of the crimes, they did so in the context of helping him evaluate his case.  The conversation remained casual throughout, and Gonzalez voluntarily revealed many details about the killings.  If anything, he seemed to be proud of his actions and was boasting to the agents.  From Gonzalez's perspective, this was a casual conversation with fellow inmates, rather than an interrogation.  *Miranda* and its progeny do not apply under these circumstances.  (See *Perkins, supra*, 496 U.S. at p. 298 ["*Miranda* was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates."].)

Gonzalez urges us not to follow the numerous cases holding *Miranda* does not apply when a defendant makes incriminating statements during a *Perkins* operation.  In support, he cites Justice Liu's statement dissenting from an order denying review in *People v. Valencia*, S258038.  (See *People v. Valencia* (Aug. 5,

12

2019, B283588) [nonpub. opn.], review den. Dec. 11, 2019,
S258038 (dis. opn. of Liu, J.).)  He also cites a case in which
the Nevada Supreme Court held a "police-initiated jailhouse
interrogation by an informant . . . amounts to custodial
interrogation contravening the Nevada Constitution."  (See
*Boehm v. State* (1997) 113 Nev. 910, 915.)  Neither Justice Liu's
statement nor Nevada caselaw are binding on us.  Moreover,
as Justice Liu noted in his statement, the California Supreme
Court has declined several opportunities to address this issue.
(See *People v. Valencia*, S258038 (dis. opn. of Liu, J.), at *5–6.)
We see no reason to depart from the unanimous and well-
reasoned appellate opinions holding *Miranda* does not apply
under these circumstances.

Gonzalez alternatively argues *Orozco* and *Felix* are
distinguishable because, in those cases, the police did not violate
the defendants' *Miranda* rights before starting the *Perkins*
operations.  Here, according to Gonzalez, the police continued
to question him after he invoked his right to counsel, but before
they placed him in the cell with the agents.

Contrary to Gonzalez's contentions, the police in *Orozco*
also continued to question the defendant after he invoked his
right to counsel.  (See *Orozco, supra*, 32 Cal.App.5th at pp. 807–
808.)  In fact, the defendant requested an attorney at least
five times before the police ended the interrogation and placed
him in a room with the baby's mother.  (*Ibid*.)  The police later
returned to the room, revealed the autopsy results, and asked
the defendant if he had anything else to say.  (*Id*. at p. 816.)  The
defendant argued this last question transformed the conversation
with the mother into an interrogation.  The court disagreed,
explaining, "Had defendant answered the officer's question with

13

an incriminating statement, he would have been interrogated. But he did not. Instead, defendant said nothing, and the officer left. At that point, defendant resumed his one-on-one conversation with [his baby's mother], completely unaware she was an agent of the police. His subsequent confession to her was accordingly not the product of an interrogation." (*Ibid*.)

The same is true here. As in *Orozco*, Gonzalez made the incriminating statements after the officers had stopped questioning him and placed him in a separate space with the agents. When Gonzalez made the statements, he was under the mistaken belief that he was having a private conversation with fellow inmates. The interrogation had ended by that point, regardless of whether the police had previously violated his rights under *Miranda*.

We also reject Gonzalez's argument that the court should have excluded his statements because he did not voluntarily waive his *Miranda* rights before making them. Gonzalez argues his statements were the product of deception and made without knowing the consequences. He asserts it is clear he did not want to confess and made the incriminating statements only after the agents lied to him.

In making this argument, Gonzalez wrongly assumes his incriminating statements could be used against him only if he waived his *Miranda* rights. However, as we discussed above, *Miranda* does not apply because the conversation with the agents was not an interrogation. Accordingly, Gonzalez's decision to speak to the agents did not require a waiver of his *Miranda* rights. (See *Orozco, supra*, 32 Cal.App.5th at pp. 813–814.)

14

## 2.     *Remand is not required under section 1385*

Effective January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill 81) amended section 1385 to require a court to "dismiss an enhancement if it is in the furtherance of justice to do so." (Stats. 2021, ch. 721, § 1; § 1385, subd. (c)(1).) As amended, subdivision (c) lists mitigating circumstances the court must consider, including that the "defendant was a juvenile when they committed the current offense or any prior offenses, including criminal convictions and juvenile adjudications, that trigger the enhancement or enhancements applied in the current case." (§ 1385, subd. (c)(2)(G).) The statute provides that "[p]roof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (*Id.*, subds. (c)(1), (c)(2).)

Gonzalez argues his case must be remanded for resentencing because, although the trial court considered striking his prior strike under section 1385, subdivision (a), it failed to consider striking it under section 1385, subdivision (c). According to Gonzalez, because he was a juvenile when he committed the strike offense, section 1385, subdivision (c) required the court to strike the prior strike unless it found dismissal would endanger public safety.[5]

---

[5]     We agree with the Attorney General that Gonzalez forfeited this argument by failing to raise it below. (See *People v. Scott* (2015) 61 Cal.4th 363, 406.) Nevertheless, because it involves a pure question of law, we will exercise our discretion to consider the issue on the merits.

15

As Gonzalez seems to acknowledge, California courts have repeatedly and uniformly held section 1385, subdivision (c) does not apply to prior strikes under the Three Strikes law. (See *People v. Burke* (2023) 89 Cal.App.5th 237, 243 (*Burke*); *People v. Olay* (2023) 98 Cal.App.5th 60, 67 (*Olay*), review den. Mar. 12, 2024; *People v. McDowell* (2024) 99 Cal.App.5th 1147, 1155; *People v. Dain* (2024) 99 Cal.App.5th 399, 412–413.)

The court in *Burke* explained that section 1385, subdivision (c) expressly applies only to an " 'enhancement,' " and the "term 'enhancement' has a well-established technical meaning in California law. [Citation.] 'A sentence enhancement is "an additional term of imprisonment added to the base term." ' [Citations.] It is equally well established that the Three Strikes law is not an enhancement; it is an alternative sentencing scheme for the current offense. [Citations.] We presume the Legislature was aware of, and acquiesced in, both this established judicial definition of enhancement and the distinction between an enhancement and an alternative sentencing scheme such as the Three Strikes law." (*Burke, supra*, 89 Cal.App.5th at p. 243.)

The court reached the same conclusion in *Olay, supra*, 98 Cal.App.5th 60. In that case, the defendant argued *Burke* was wrongly decided because the court failed to consider the fact that the amended statute refers to "criminal convictions and juvenile adjudications, that trigger the enhancement or enhancements applied in the current case." (§ 1385, subd. (c)(2)(G).) The defendant argued, because there are no juvenile adjudications that trigger enhancements—but there are juvenile adjudications that trigger application of the Three Strikes law— the Legislature must have intended the term "enhancement" in

16

section 1385, subdivision (c) to encompass the Three Strikes law. (*Olay*, at pp. 66–67.)

The *Olay* court was skeptical that the Legislature would have "expressed an intent to reject the well-established legal meaning of 'enhancement' in such a roundabout manner by obliquely referencing 'juvenile adjudications' as one of the relevant mitigating circumstances." (*Olay*, *supra,* 98 Cal.App.5th at p. 67.) Nevertheless, it agreed this aspect of the statute is ambiguous. Accordingly, the court examined the legislative history of Senate Bill 81 to determine the Legislature's intent. (*Olay*, at p. 68.) The court found a June 2021 bill analysis by the Assembly Committee on Public Safety contains the only reference to the intended meaning of "enhancement." (See *Olay*, at pp. 68–69.) The analysis distinguishes enhancements from alternative sentencing schemes—such as the Three Strikes law—and then states the "presumption created by this bill applies to enhancements, but does not encompass alternative penalty schemes." (See Assem. Com. on Public Safety, Analysis of Sen. Bill No. 81 (2021–2022 Reg. Sess.) as amended Apr. 27, 2021, pp. 5–6.) The court explained this analysis demonstrates the Legislature did not intend section 1385, subdivision (c) to apply to the Three Strikes law. Accordingly, the *Olay* court agreed with *Burke* that the term "enhancement" in section 1385 does not apply to the Three Strikes law. (*Olay*, at p. 69.)

Gonzalez suggests *Olay* and *Burke* are distinguishable because the prior strikes in those cases were adult convictions, while his strike is a juvenile adjudication. We do not find this distinction to be meaningful. The analysis in *Olay* and *Burke* does not depend on the fact that those cases concerned prior adult convictions. Instead, the courts reasoned that the term

17

"enhancement" has a legal meaning that excludes alternative sentencing schemes. The *Olay* court further determined, to the extent the statutory language is ambiguous, the legislative history confirms the Legislature did not intend for section 1385, subdivision (c) to apply to alternative sentencing schemes. The Three Strikes law is an alternative sentencing scheme, regardless of whether its application arises from an adult conviction or a juvenile adjudication. Accordingly, the *Burke* and *Olay* courts' reasoning applies equally to this case, and we reject Gonzalez's arguments to the contrary.

3.      ***Remand is not required under section 1170***

Effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567) amended Penal Code section 1170, subdivision (b), to limit the sentencing discretion of trial courts. (Stats. 2021, ch. 731, § 1.3.) As amended, the statute now provides, "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) A sentencing court also may consider the defendant's prior convictions based on a certified record of conviction without submitting those prior convictions to a jury. (*Id*., subd. (b)(3).)

Also effective January 1, 2022, Assembly Bill No. 124 (2021–2022 Reg. Sess.) (Assembly Bill 124) amended section 1170, subdivision (b)(6) to require the imposition of the low term if any of the following "was a contributing factor in the commission of the offense": the defendant "has experienced

18

psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence"; the defendant was a youth (defined as anyone under the age of 26) when he or she committed the offense; or the defendant had been the "victim of intimate partner violence or human trafficking." (Stats. 2021, ch. 695, § 5.1; § 1170, subd. (b)(6)(A)–(C); § 1016.7, subd. (b).)

The trial court sentenced Gonzalez on April 17, 2023. At the hearing, defense counsel argued that, because the jury had not found the alleged aggravating circumstances to be true, the "new law" precluded the court from imposing upper terms on the felon in possession count and the firearm enhancement. The court selected the midterm on the felon in possession count; however, it selected the upper term on the firearm enhancement. The court did not explain its reasons for either selection.

Gonzalez urges us to remand the case for resentencing on the firearm enhancement so the trial court may exercise its discretion under section 1170, as amended by Senate Bill 567 and Assembly Bill 124. As best we can tell, Gonzalez does not contend the court lacked authority to impose an upper term on the firearm enhancement. To the contrary, he seems to concede the court had discretion to impose the upper term based on his prior juvenile adjudication, which he admitted after waiving his right to a jury trial. (See § 1170, subd. (b)(2) [a court may consider aggravating factors stipulated to by the defendant].) Instead, Gonzalez argues it is possible the court considered additional factors beyond his juvenile adjudication, to which he did not stipulate and a jury had not found to be true. Gonzalez contends remand is required because it is not clear

19

whether the trial court would have chosen the upper term had it considered only the juvenile adjudication.

It is "a fundamental tenet of appellate review that we presume on a silent record the court properly exercised its discretion." (*People v. Frazier* (2020) 55 Cal.App.5th 858, 868.) "[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.) To overcome the presumption, the defendant must affirmatively demonstrate the trial court misunderstood the law. (*People v. Lee* (2017) 16 Cal.App.5th 861, 866–867 (*Lee*).)

There is no indication in the record that the trial court was unaware of the amendments to section 1170 or misunderstood the scope of its discretion under them. At sentencing, defense counsel referred to the amendments and argued they limited the court's sentencing discretion. Although the court did not explain its reasons for selecting the upper term on the firearm enhancement, there is nothing even to suggest the court relied on improper factors to do so. On this record, Gonzalez has failed to meet his burden to show error affirmatively. (See *Lee, supra*, 16 Cal.App.5th at pp. 866–867.)

Gonzalez's reliance on *People v. Salazar* (2023) 15 Cal.5th 416 is misplaced. In that case, the defendant's appeal was pending when the relevant amendments to section 1170 went into effect. (*Salazar*, at p. 423.) The high court explained that, when the applicable law governing the defendant's sentence has substantively changed after sentencing—in which case the court

20

was not fully aware of the scope of its discretionary powers—the proper remedy is to remand unless the record clearly indicates the court would have reached the same conclusion had it been aware of its discretion. (*Id.* at p. 425.)

Here, the law governing Gonzalez's sentence did not substantively change while his case was on appeal. Instead, the trial court sentenced Gonzalez more than a year after the relevant amendments to section 1170 went into effect. Under these circumstances, we may presume the court was aware of its sentencing discretion and complied with the law when it imposed Gonzalez's sentence. (See *Lee, supra*, 16 Cal.App.5th at pp. 866–867.) Gonzalez has the burden to demonstrate otherwise, which he has failed to do.

## DISPOSITION

We affirm the judgment.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


ADAMS, J.


21