Filed 4/30/26  P. v. Cook CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085005 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD291807) |
| JAMAR COOK, Jr., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Steven E. Stone, Judge.  Affirmed.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Collette C. Cavalier, and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

Jamar Cook, Jr. appeals a judgment of conviction after a jury found him guilty of first degree murder, five counts of attempted murder, and other crimes arising out of a gang-motivated drive-by shooting. He contends the trial court erred by admitting into evidence certain recorded statements he made to a covert law enforcement agent during an undercover jailcell operation. He asserts the statements were inadmissible because law enforcement procured the statements from him after he had invoked his right to remain silent and his right to counsel, thus violating his rights under the Fifth and Fourteenth Amendments to the United States Constitution. Alternatively, he claims his substantive due process rights were violated because law enforcement targeted his vulnerability as a young adult during the undercover operation.

We need not decide whether the statements at issue were admissible because, assuming the trial court erred by admitting the statements, the People have established beyond a reasonable doubt that the admitted statements did not influence the verdict. Because the admission of the statements was harmless error, at most, we affirm the judgment.

# II

## BACKGROUND

On June 13, 2024, the San Diego County District Attorney filed an amended information charging Cook with the murder of Dorian Franklin (Pen. Code, § 187, subd. (a); count 1),[1] five counts of attempted murder (§§ 664, 187, subd. (a); counts 2–6), shooting at an occupied building (§ 246; count 7), and two counts of carrying a loaded firearm that was not registered

---

[1] Further undesignated statutory references are to the Penal Code.

to Cook (§ 25850, subd. (a); counts 9–10).[2] Counts 1 through 7 arose out of a gang-motivated drive-by shooting, while counts 9 and 10 arose out of an unrelated incident.

As to count 1, the amended information alleged a special circumstance for shooting from a vehicle (§ 190.2, subd. (a)(21)), gun-use enhancements (§ 12022.53, subds. (d) and (e)(1)), a gang enhancement (§ 186.22, subd. (b)(5)), and an on-bail enhancement (§ 12022.1, subd. (b)). As to counts 2 through 6, it alleged premeditation and deliberation (§ 189), gun-use enhancements (§ 12022.53, subds. (c), (d), (e)(1)), gang enhancements (§ 186.22, subd. (b)(5)), and on-bail enhancements (§ 12022.1, subd. (b)). As to count 7, it alleged a gun-use enhancement (§ 12022, subd. (a)(1)), a gang enhancement (§ 186.22, subd. (b)(4)), and an on-bail enhancement (§ 12022.1, subd. (b)). The amended information also alleged four aggravating factors. (Cal. Rules of Court, rule 4.421(a)(3), (a)(5), (a)(8), (b)(1).) At the request of the defense, the court bifurcated trial on the gang enhancement allegations, the on-bail enhancement allegations, the aggravating factors, and counts 9 and 10.

After a trial, the jury found Cook guilty of counts 1 through 7. The jury also returned true findings on the special-circumstance and gun-use allegations for those counts. The trial court granted the prosecution's motion to dismiss counts 9 and 10, the gang enhancements for counts 1 through 7, and the on-bail enhancements for counts 1 through 7. In a bifurcated bench trial, Cook admitted the aggravating factors.

---

[2] The amended information also charged counts 1 through 7, as well as count 8 (possession of a firearm by a felon), against Cook's codefendant, Elijah Smith. Smith entered into a plea agreement before trial and pleaded guilty to one count of first degree murder with gun-use and gang enhancements.

The court sentenced Cook to state prison for life without the possibility of parole (LWOP), plus 50 years to life, plus five terms of life with parole, plus 84 years, which it calculated as follows: (1) LWOP on count 1, plus 25 years to life for the related gun-use enhancement; (2) life with the possibility of parole on count 2, plus 25 years to life for the related gun-use enhancement; (3) four terms of life with the possibility of parole on counts 3 through 6, plus 20 years for each related gun enhancement; and (4) the low term of three years on count 7, plus one year for the related gun-use enhancement.

A. *Prosecution Case*

Mike's Market is a liquor store in the Mountain View neighborhood of San Diego. As of 2021, it was well known as a place where members of the 5-9 Brims criminal street gang congregated. Mike's Market is a few blocks east of territory claimed by West Coast Crips, a rival criminal street gang.

On September 20, 2021, at 3:37 p.m., a drive-by shooting occurred while 17 people were gathered in the Mike's Market parking lot to watch a fistfight. Surveillance video from Mike's Market showed a white Honda Civic with spoked wheels, a damaged bumper, and a damaged driver-side mirror as it drove by the market in a westbound direction. The front passenger window and rear passenger window were both rolled down. A person in the front passenger seat wore a red cloth over the lower half of his face, and extended a handgun wrapped in a blue cloth out of the front passenger window. At least 10 shots were fired from the car into the parking lot, though the exact number of shots fired is indecipherable from the surveillance video. One person in the parking lot, Franklin, was struck by a bullet in the upper left back and died later that day. A second person, V.W., suffered non-fatal gunshot wounds to his right forearm and right thigh. Two additional bullets struck a nearby home.

Crime scene investigators later recovered six 9-millimeter shell casings and a bullet fragment from the parking lot. A bullet was also recovered from Franklin's body. The markings on the shell casings were consistent with being fired from the same gun, which was never found. According to a ballistics analysis, the bullet recovered from Franklin's body was most likely fired by a Smith & Wesson or an FN Herstal gun. The markings on the bullet were inconsistent with being fired from a Beretta gun.

At 4:15 p.m., about 40 minutes after the shooting, a police sergeant familiar with the description of the Honda Civic saw the car parked in the parking lot of a 7-Eleven store located a 20-minute drive from Mike's Market. Three young men stood by the car. They were later identified as Smith, a 24-year-old member of the Linda Vista Crips gang; Cook, an 18-year-old member of West Coast Crips, and J.M., a 15-year-old member of West Coast Crips. Surveillance video from the 7-Eleven showed the Honda Civic pulling into the parking lot at 4:12 p.m., 35 minutes after the shooting. The occupants exited the car, entered the store to buy merchandise, and returned to the car. Smith exited the car from the driver seat, Cook exited from the front passenger seat, and J.M. exited from the backseat. After the sergeant identified the suspect car, the young men got back into the car in the same seats they previously occupied and drove into a nearby alley. Smith lived on the same block as the alley, and J.M. lived close by.

The next day, officers arrested Smith as he drove away from his apartment in the Honda Civic. They searched his apartment and recovered several items with Cook's DNA on them, including a toothbrush, shoes, a backpack, and clothing. One of the articles of clothing with Cook's DNA on it matched the appearance of a pair of black pants he had worn the previous day. Several items with Cook's DNA on them also tested positive for gunshot

5

residue, including the black pants. Cook's DNA was found on the front passenger armrest and control buttons of the Honda Civic as well. Meanwhile, J.M. was excluded as a contributor to a DNA mixture found on the front passenger armrest and control buttons.

On October 6, about two weeks after the shooting, officers arrested Cook and J.M. After the arrest, a police detective told Cook he would be charged with murder and attempted murder for shooting into a crowd of people. The detective also showed Cook surveillance images of himself and his companions at the 7-Eleven. The detective tried to interview Cook, but Cook declined to speak with the detective and invoked his right to counsel and his right to remain silent under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).[3]

At the police station, officers placed Cook and J.M. together in the same holding cell, which was under covert video and audio surveillance. While Cook and J.M. were in the holding cell, they discussed the murder and attempted murder charges they faced. At one point during their conversation, Cook said, "I'm not going to get out. I'm going to get life." Shortly after, J.M. said, "one of those [n-words] is dead bro. … [B]oth of us were there bro."

Later that day, officers placed Cook and J.M. in the back of the same patrol car, where their conversation was again covertly recorded. During the conversation, Cook implored J.M. to accept responsibility for the murder because J.M. was a juvenile. Cook stated, "Tell them you want to talk. Cuz, you're a juvenile you feel me. [Unintelligible] When you go to court just tell

---

[3] The details of the detective's attempt to interview Cook and Cook's invocation of his *Miranda* rights are sparse. However, for purposes of this appeal, it is sufficient to note that the prosecution stipulated that Cook effectively invoked his *Miranda* rights shortly after his arrest.

them like, 'I'll take the murder charge, I want a deal.' Don't crip." Soon after, Cook repeated his request to J.M., stating, "When you go to court Friday, just tell your attorney, not this court date, but the next court date, that 'I'm going to plead guilty to the murder.'" Almost immediately after, he reiterated his demand yet again, stating, "Friday, though, you gotta tell them like, 'I don't want my friends doing any jail time. I'm gonna take the M.'"

During the same conversation, J.M. instructed Cook not to speak with anyone in the jail holding cell because he could be speaking to an undercover law enforcement agent. J.M. stated, "And don't say shit in no holding tank bro. Even if they ask you what's going on, tell them you're here on something else. Cuz, they put up an undercover (cop) up there and everything, bro. Don't crip. No talking." Cook replied, "I already know."

As the conversation continued, J.M. and Cook discussed some of the evidence against them. J.M. said, "All these [n-words] know what's going on. [E]very police here. [Unintelligible] All the [n-words] know. Detective, like fucking detective. Every [n-word] sitting right there know, bro …. [Unintelligible] They talk about we know you, and have something to do with it." Cook asked J.M. if they "showed [him] the pictures," and said, "They showed me pictures of us at the 7-Eleven store." J.M. then stated, "The only good part about it is, I live [Unintelligible] around the corner from that 7-Eleven [n-word], you feel me? I live right there. Don't Crip. That [n-word] lives right around the corner from me, you feel me. That's the only thing saving us. We all on camera at the 7-Eleven, that's nothing. We didn't do shit bro; we went to a 7-Eleven."

The conversation then returned to the criminal charges the young men faced and how they might try to concoct an alibi to rebut the charges. Cook stated, "Attempted murder is fine. Fuck." J.M. replied, "You got 16 of them

bro! You feel me. They gonna bullshit for that, bro. You gotta prove, bro. … You gotta really prove that you wasn't there bro." Cook asked, "How the fuck," and J.M. replied, "Cuz bro, if those are the only pictures, the 7-Eleven. That's what I'm saying, if those are the only pictures; you and me were at my pad [n-word]. We spent the night at my mama's, you feel me." Cook then asked, "what if we can't prove it?" J.M. responded, "My mama and me as a witness," to which Cook replied, "The cameras."

As the conversation concluded, Cook again called on J.M. to accept the blame for the murder. Cook stated, "All I know is [you're] gonna take that charge. You feel me," and, "You're gonna take this off our shoulders." Cook continued, "But look though, okay, I was there, so I'm going to get charged with it too. But in the end, we need that off our, me and [Smith], we need that off our shoulders."

The following day, investigators conducted an undercover operation commonly known as a *Perkins* operation.[4] During the operation, investigators placed Cook and a law enforcement agent posing as an inmate in the same secretly-recorded jailcell to obtain information from Cook.[5] The operation lasted 88 minutes. The audio recording from the operation captures most of the agent's statements to Cook, but Cook whispered throughout the operation and many of his statements to the agent are

---

[4]     The term *Perkins* operation derives its name from *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

[5]     Investigators placed a second undercover agent in the jail cell, but removed him shortly after the operation began. Investigators did not engage in any other tactics to stimulate conversation between Cook and the undercover agent who remained in the cell.

8

inaudible or unintelligible. At times, the agent purported to repeat aloud some of Cook's inaudible or unintelligible statements.

When the operation began, Cook introduced himself to the undercover agent as a West Coast Rollin' 30's Crip and said he was 18 years old. He also stated he had been arrested the previous day. The agent introduced himself as "East Riverside," and said he had just done "18 straight" for attempted murder. At the outset of the operation, Cook maintained his innocence, telling the agent he was "innocent," he would "prove [his] innocence," and, "All they doin' is just pointing fingers."

It is not clear from the inaudible or unintelligible portions of the recording whether Cook disclosed to the agent that he was involved in a shooting. However, at one point during the conversation, the agent volunteered that, "[a]s long as there's no cameras in your case and no [bullet] shells, you're cool." Soon after, the agent said Cook did not have to worry "if they don't find a strap," and "don't find a gun." Cook replied with an unintelligible statement, the agent stated, "Oh, -- oh, yeah, two of them," and Cook replied, "Clean," which possibly suggested that Cook had stated in the inaudible portion of the recording that he and his companions had possessed two clean guns. Later in the operation, the agent stated, "you said there was two straps," and "[i]f there were both used, then that meant two shooters." Cook replied with further unintelligible statements. Shortly after, the agent asked if they were "the same kinda caliber or different kind of caliber," and Cook said, "Nine." Cook made another unintelligible statement, to which the agent replied, "Smith and Wesson? Revolver? Oh, I was like, you're good if they all stayed there. On what? Smith and Wesson nine? And the other one was what?" Cook replied, "Beretta, nine." Law enforcement removed Cook from the jailcell and ended the *Perkins* operation soon afterwards.

9

Police also executed a search warrant for Cook's Instagram account. According to Cook's Instagram records, Cook (or someone using his Instagram account) sent messages to another Instagram user on September 6 and 7, 2021, two weeks before the murder, asking to borrow a gun. The other user asked Cook whether he needed an extended magazine, and Cook said he did. The other user then said, "I got you." On September 9, Cook (or someone using his account) sent messages to a different Instagram user also asking to borrow two firearms.

Cook's Instagram records and other evidence suggested Cook and his companions perpetrated the shooting as retaliation for the death of Dale Howard, a West Coast Crips member who was shot and killed in August 2021. On September 16, four days before the shooting at Mike's Market, a fellow West Coast Crips member sent Cook an Instagram message with a photograph of Cook at Howard's gravesite. On September 20, the day of the shooting, the same gang member sent Cook a message telling him to "come to the grave," and stating that "all of us" would be there. J.M.'s phone also had photographs and videos of J.M. and Cook that were taken at Howard's gravesite on September 16 and 19, 2021.

B. *Defense Case*

J.M. testified as a defense witness. J.M. testified that he had admitted in juvenile court to murdering Franklin for the benefit of a criminal street gang and he had admitted to personally and intentionally discharging a firearm that proximately caused great bodily injury or death. J.M. stated he had been sentenced already and was expected to be released from custody at the age of 21.

J.M. testified that on the morning of the shooting, he and five or six others, including Smith and Cook, visited Howard's gravesite. J.M. testified

10

he left with Smith and Cook, and decided to shoot up Mike's Market to kill members of 5-9 Brims.  J.M. stated he discussed the idea with Smith "minutes" before the shooting while Cook was in the car.  J.M. said he was in the front passenger seat and Cook was in the back seat.  He stated he fired a stolen Beretta gun out of the window, "emptied it," and "didn't stop until the gun clicked."  J.M. initially denied that Cook fired a gun, but later stated on cross-examination that he did not know whether Cook had fired a gun.  According to J.M., he and his companions went to 7-Eleven and then Smith's apartment after the shooting.  J.M. stated he returned to his own home later that evening and left his gun at Smith's apartment.

Dr. Kristina Malek, a clinical and forensic psychologist, also testified as a defense witness.  The defense retained Dr. Malek to assess Cook's psychological functioning and prepare a general mitigation evaluation.  Dr. Malek met with Cook three times for a total of six hours.  Based on testing Dr. Malek administered to Cook, and her review of his education records, Dr. Malek diagnosed Cook with mild intellectual development disorder.  According to Dr. Malek, an adult with mild intellectual development disorder typically has trouble with abstract reasoning, executive functioning, and short-term memory, and might have a limited understanding of risk in social situations.  Dr. Malek testified that the frontal cortex (the outer layer of the frontal lobe) is responsible for abstract reasoning, planning, and impulse control, and late adolescents like Cook have frontal lobes that are still developing.

# III

# DISCUSSION

A. *The Alleged Miranda Violation was Not Prejudicial*

Prior to trial, Cook moved to suppress the statements he made to the undercover agent on the ground that the *Perkins* operation violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution. In particular, he argued the *Perkins* operation violated his constitutional rights because law enforcement agents covertly interrogated him and obtained the statements from him after he had invoked his *Miranda* rights. The trial court denied the motion to suppress, finding the statements were admissible because Cook voluntarily spoke to the undercover agent and the *Perkins* operation was not the type of custodial interrogation implicating *Miranda* concerns. On appeal, Cook challenges the court's denial of his motion to suppress and its admission of the *Perkins* operation evidence.

In its seminal *Miranda* decision, the United States Supreme Court "established the now-familiar rule that prosecutors may not admit a suspect's statements in their case-in-chief against the suspect-defendant unless' prior to making those statements, the suspect was properly advised of the right to remain silent and the right to an attorney. [Citation.] *Miranda* was based on the Fifth Amendment privilege against self-incrimination, which 'has consistently been accorded a liberal construction.' [Citation.] The exercise of that privilege 'will be scrupulously honored,' and 'the privilege is fulfilled only when the person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." ' " (*People v. Zapata* (2026) 118 Cal.App.5th 529, 537–538 (*Zapata*).)

" 'Critically, however, *Miranda*'s rule has a limit: It only applies when the suspect-defendant was the subject of "custodial interrogation" ' because

12

those circumstances ' "contain[ ] inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so." ' [Citation.] '[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " (*Zapata, supra*, 118 Cal.App.5th at p. 538.)

A criminal suspect may also waive his or her *Miranda* rights. (*Miranda, supra*, 384 U.S. at p. 475.) To establish waiver, the State bears the burden of demonstrating that the suspect's waiver of his or her *Miranda* rights is voluntary, knowing, and intelligent. (*Id.* at pp. 444, 475, 479.) "The inquiry has two distinct dimensions. [Citations.] First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran v. Burbine* (1986) 475 U.S. 412, 421.)

In *Edwards v. Arizona* (1981) 451 U.S. 477, 484–485 (*Edwards*), the United States Supreme Court announced a judicially-prescribed rule that a suspect who invokes the right to counsel may not be "subject to further interrogation by the authorities until counsel has been made available to [the suspect], unless the [suspect] himself [or herself] initiates further communication, exchanges, or conversations with the police." *Edwards* reasoned, "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he [or she] has clearly asserted [the] right to counsel." (*Id.* at p. 485.) "The rationale of

13

*Edwards* is that once a suspect indicates that 'he is not capable of undergoing [custodial] questioning without advice of counsel,' 'any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect.' [Citation.] Under this rule, a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." (*Maryland v. Shatzer* (2010) 559 U.S. 98, 104–105.)

Nine years after *Edwards*, the United States Supreme Court issued *Perkins*, which held that "an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." (*Perkins, supra*, 496 U.S. at p. 300.) *Perkins* concluded that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*" because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." (*Id.* at p. 296; see *id.* at pp. 296–297 ["There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess."].) Because "*Miranda* forbids coercion, not mere strategic deception[,] … [p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." (*Id.* at p. 297.)

The present case stands at the intersection of these decisions. Cook argues that *Edwards* governs here—not *Perkins*—because law enforcement

14

used an undercover agent to elicit statements from him after he exercised his *Miranda* rights. However, "California courts have uniformly come to the conclusion that *Perkins* controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the police." (*People v. Orozco* (2019) 32 Cal.App.5th 802, 815 (*Orozco*) [defendant's prior invocation of right to counsel did not require suppression of his statements to victim's mother acting as undercover police agent]; see *People v. Felix* (2024) 100 Cal.App.5th 439, 451, 450–453 [defendant who made statements to undercover detective after invoking right to remain silent was "not subjected to coercive interrogation of the type of which *Miranda* was concerned"]; *People v. Plyler* (1993) 18 Cal.App.4th 535, 544–545 [no Fifth Amendment violation where law enforcement ordered defendant to call victim's house after asserting right to counsel]; *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1537–1542 [no Fifth Amendment violation where defendant asserted *Miranda* rights, then made admissions to victim working for law enforcement]; but see *Zapata, supra*, 118 Cal.App.5th at p. 533[6] ["When a suspect invokes and does not waive the right to counsel, and a known law enforcement officer continues to 'stimulate' a *Perkins* operation in a manner that amounts to a custodial interrogation, the suspect's resulting incriminating statements are inadmissible.]; *Felix*, at pp. 453–454 (dis. opn.

---

[6] After briefing was complete, we ordered the parties to file supplemental letter briefs addressing the application, if any, of *Zapata, supra*, 118 Cal.App.5th 529, to this case. Both parties filed briefs stating that *Zapata* is distinguishable from this case because, in *Zapata*, a known law enforcement officer continued to "stimulate" conversation during a *Perkins* operation with a criminal suspect who had invoked his right to counsel—a material fact that is absent here. The parties agreed that *Zapata*'s central holding concerning the admissibility of a suspect's statements under such circumstances is not controlling here, and we agree with them.

of Stratton, J.) ["I do not agree with the majority that it was permissible for a *Perkins* agent to interrogate appellant after he invoked his right to counsel without getting an express waiver of that right."].)

For example, the *Orozco* court concluded that "*Perkins* controls," not *Edwards*, when "a suspect invokes his *Miranda* right to counsel and law enforcement subsequently orchestrates a conversation between the suspect and someone the suspect does not know is an agent of law enforcement." (*Orozco, supra*, 32 Cal.App.5th at p. 812.) As the *Orozco* court explained, *Edwards*, by its own terms, prohibits continued police "interrogation" after a suspect has invoked his or her *Miranda* rights, unless counsel is present or the suspect initiates an exchange with law enforcement. (*Orozco*, at p. 813.) However, according to the *Orozco* court, an "interrogation" occurs only when "(1) the suspect is talking to the police or an agent of the police, *and* (2) the suspect is *aware* that he is talking to the police or one of their agents." (*Ibid.*) "Conversely, there is no 'interrogation' when a suspect speaks with someone he does not know is an agent of the police." (*Id.* at p. 814.)

*Orozco* further reasoned that "the rationale underlying *Miranda* dictates that *Perkins*, not *Edwards*, should control." (*Orozco, supra*, 32 Cal.App.5th at p. 814.) According to *Orozco*, *Miranda*'s prophylactic measures are "designed to dispel the 'compelling' 'psychological' 'pressures' that are part and parcel of 'in-custody interrogation.'" (*Ibid.*) "*Edwards*'s rule is based on those same pressures: A suspect's invocation of his *Miranda* right to counsel means 'he is not capable of undergoing such questioning without advice of counsel,' and 'any subsequent waiver [by the suspect of his *Miranda* rights] ... has come at the authorities' behest, and not at the suspect's own instigation.'" (*Ibid.*) "Because '[t]he essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an

16

incarcerated person speaks freely to someone' that he thinks is a lover, a family member, a friend or even a fellow criminal [citations], *Miranda*'s (and, by extension, *Edwards*'s) purpose in combating that atmosphere and compulsion is simply not implicated in such situations." (*Ibid.*)

Cook acknowledges these authorities, but argues they are incorrect because, in his view, *Miranda* and its progeny prohibit law enforcement from engaging in *any* deception to procure statements from a suspect—not merely coercion—after a suspect has invoked his or her *Miranda* rights. The California Supreme Court has granted review in a case to determine the admissibility of incriminating statements obtained from a suspect during a *Perkins* operation after the suspect has invoked the right to remain silent. (*People v. Allen* (July 22, 2024, B328333) [nonpub. opn.], review granted Nov. 20, 2024, S286520.) However, in this case, we need not determine whether Cook's statements to the undercover agent were admissible because, even if we assume the court erred by admitting the statements, the ruling did not prejudice Cook.

" 'The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 …. That test requires the People … "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " (*People v. Case* (2018) 5 Cal.5th 1, 22.) The People have satisfied this burden in the present case.

At trial, the defense did not contest that Cook was present in the Honda Civic together with Smith and J.M. The defense also conceded that the person in the front passenger seat of the car fired shots at the individuals standing outside Mike's Market. However, the parties disputed whether the

17

person in the front passenger seat who fired shots into the crowd was Cook or J.M., and whether the person in the back passenger seat *also* fired shots at the crowd of people.

The statements Cook made to the undercover agent during the *Perkins* operation did not definitively answer either of these questions. Indeed, Cook spoke to the undercover agent in whispers throughout the *Perkins* operation, causing most of his statements to be inaudible or unintelligible on the audio recording of the operation. Further, as Cook himself acknowledges in his appellate briefs, "none of the audible/comprehensible statements on tape included Cook saying he *fired* a gun or that he was the person in the front seat, who was visible firing a gun in the market's surveillance video." In other words, the *Perkins* operation evidence was a far cry from a damning confession. Nonetheless, Cook contends the admission of the evidence was prejudicial because certain of his statements implied that he and his companions possessed, and possibly fired, two guns during the shooting.

We agree with Cook that certain of his statements—as obscure and muddied as they were—tended to suggest that two guns may have been involved in the shooting. But, as the People persuasively explain, the admission of these statements did not impact the verdict considering the overwhelming evidence that Cook fired a gun into the crowd outside Mike's Market. In the weeks preceding the shooting, Cook (or someone using his Instagram account) messaged multiple Instagram users asking to borrow or buy more than one firearm. Soon after the shooting, surveillance footage from the 7-Eleven showed Cook exiting and later sitting back down in the front passenger seat of the Honda Civic—a position from which a shooter *indisputably* fired a gun at the crowd. And when police apprehended Cook and J.M., Cook repeatedly implored J.M. to take the fall for the murder

18

("take the M") because J.M. would face a less severe punishment as a juvenile, and Cook "need[ed] that off [his] shoulders."

The physical evidence also strongly corroborates our conclusion that the *Perkins* operation evidence did not influence the verdict. A DNA mixture taken from the front passenger armrest and power control buttons of the car included Cook's DNA. By contrast, J.M. was excluded as a contributor to the DNA mixture. This DNA evidence was extremely persuasive evidence that Cook (not J.M.) was the shooter in the front passenger seat. The clothing Cook wore on the day of the shooting also tested positive for gunshot residue. Further, although J.M. testified that he fired a stolen Beretta gun into the crowd at Mike's Market, the markings on the bullet recovered from Franklin's body were inconsistent with being fired from a Beretta gun, and consistent with being fired from a Smith & Wesson or FN Herstal gun. Thus, even if the jury were to accept J.M.'s testimony that he fired a stolen Beretta gun into the crowd, the ballistics analysis constitutes highly compelling evidence that Cook fired a different gun (a Smith & Wesson or an FN Herstal) that struck and killed Franklin.

Given the extremely strong evidence of guilt—including the messages on Cook's Instagram account, the surveillance footage from the 7-Eleven showing Cook exiting and sitting back down in the front passenger seat of the car, the presence of Cook's DNA in the front seat, the absence of J.M.'s DNA from the front seat, the presence of gunshot residue on Cook's clothing, Cook's repeated admonitions that J.M. should take the murder charge "off [his] shoulders," and the ballistics analysis of the bullet recovered from Franklin's body—we conclude the People have established, beyond a reasonable doubt, that the admission of Cook's vague and fleeting references to two guns during the *Perkins* operation did not influence the verdict.

19

B. *Cook Forfeited His Due Process Argument*

Cook also asks that we reverse the judgment because the prosecutor relied on evidence the government obtained through outrageous conduct that violated his substantive due process rights. Cook asserts the government engaged in outrageous conduct because it used deception and targeted his vulnerability as a young adult during the *Perkins* operation, after he had invoked his right to remain silent and his right to counsel.

" ' "[N]o procedural principle is more familiar to [the] Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) " 'The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected.' " (*Id.* at p. 881; see also *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 ["If a defendant fails to make a timely objection on the precise ground asserted on appeal, the error is not cognizable on appeal."].)

Cook's trial counsel objected to the admission of the *Perkins* operation evidence, but only on the ground that Cook was allegedly subjected to a custodial interrogation in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution. In the preceding section, we rejected Cook's argument that the alleged Fifth Amendment violation compels a reversal of the judgment. Further, Cook does not renew his Sixth Amendment claim on appeal.[7] As for Cook's appellate claim that the government engaged in outrageous conduct in violation of his substantive due process rights, Cook's trial counsel did not object to the admission of the

---

[7] To the contrary, Cook concedes on appeal that the government did not interfere with his Sixth Amendment right to counsel.

statements on this specific basis. Because Cook did not raise his substantive due process argument below, he has forfeited his claim of error on appeal. (See *People v. Low* (2010) 49 Cal.4th 372, 393, fn. 11 [due process challenge based on claim of outrageous government conduct forfeited where not raised at trial]; *People v. Maury* (2003) 30 Cal.4th 342, 418, fn. 17 [same].)

Cook acknowledges that his trial counsel did not object to the admission of the *Perkins* operation evidence on substantive due process grounds, but contends, as an alternative basis to reverse the judgment, that his trial counsel's failure to object on this basis constituted ineffective assistance of counsel. We are not persuaded. To prevail on an ineffective assistance of counsel claim, a defendant must "demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result." (*People v. Dennis* (1998) 17 Cal.4th 468, 540–541; see *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

We need not assess the merits of Cook's claim of ineffective assistance of counsel because Cook cannot demonstrate that his trial counsel's conduct prejudiced him. As we have discussed, the People have established, beyond a reasonable doubt, that the admission of the *Perkins* operation evidence did not influence the verdict. Because the admission of the evidence did not influence the verdict, Cook cannot show that he would have obtained a more favorable verdict if his trial counsel had objected to the evidence on substantive due process grounds. (See *People v. Caro* (2019) 7 Cal.5th 463, 497 ["the first two statements were harmless beyond a reasonable doubt. Any claim of ineffective assistance of counsel based on these statements

21

necessarily fails for the same reason"]; *People v. Jennings* (2010) 50 Cal.4th 616, 654, fn. 15 ["we need not address defendant's ineffective-assistance-of-counsel claim in light of our conclusion that any error in admitting [the evidence] was harmless beyond a reasonable doubt"].)

IV

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

DO, J.

KELETY, J.